418 So.2d 989 (1982)
Eldred Lonnie MOODY, Appellant,
v.
STATE of Florida, Appellee.
No. 52907.
Supreme Court of Florida.
July 15, 1982.
Rehearing Denied September 14, 1982.
*990 Richard L. Jorandby, Public Defender, Craig S. Barnard, Chief Asst. Public Defender, and Jerry L. Schwarz, Richard B. Greene and Jon A. May, Asst. Public Defenders, Fifteenth Judicial Circuit, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., and Max Rudmann, Asst. Atty. Gen., West Palm Beach, for appellee.
ALDERMAN, Chief Justice.
Eldred Lonnie Moody was convicted of the first-degree, premeditated murder of Murray Bell and, consistent with the jury's recommendation, was sentenced to death by the trial court. On appeal, we affirm his conviction, but we reverse his sentence of death and remand for resentencing without an additional jury recommendation because the trial court considered an improperly found aggravating circumstance in this case where there was also a properly found statutory *991 mitigating circumstance and because the trial court apparently did not consider nonstatutory mitigating circumstances.
The victim, Murray Bell, a man in his sixties, lived alone in his trailer and mowed lawns and sold peanuts for a living. Bell knew Moody and apparently thought him to be a friend. On several occasions, Moody asked Bell for money and advised Bell that the money was for religious purposes. He told Bell that if Bell did not give him the money, Bell would die. He also told an elderly lady friend of Bell's that if she did not raise the money for him, he was going to see either her or Bell murdered.
On February 17, 1977, Moody was without money and without a place to live. He, Athena Mock, Sherry Bassett, and Mock's child had been sleeping in Bassett's Volkswagen for several days prior to the murder. The morning of February 17, 1977, Moody went to Bell's trailer with the intention of getting Bell's van. When Bell refused to give Moody the van, Moody again threatened him. Moody, along with Mock, Bassett, and the child, then left Bell's trailer. Moody stopped at a TG&Y store and bought a knife. Then between 3 and 5 p.m., he, Mock, Bassett, and the child returned to Bell's trailer and entered through the back door. Moody ransacked the trailer and spread paper towels throughout the trailer. In response to her inquiry as to what he was doing, Moody told Mock that paper towels burn easily. They then waited for Bell to return, without having turned on any lights. When Bell returned, Moody motioned for the women and the child to go to the back bedroom, which they did. Mock testified that she heard much noise from the living room  banging around, scuffling, and grunting and groaning, and yelling from the victim. She heard Bell beg Moody not to kill him. Moody then came to the bedroom door and told them they could come out. He then took a paper sack with money in it and his yellow jacket and placed these in the Volkswagen. As they were leaving, Mock saw a puddle of blood on the floor.
At Moody's direction, Mock left in the Volkswagen, and Bassett drove away in Bell's van. He told them to wait for him down the road because the Lord still wanted him to burn the trailer. Several minutes later after he had joined them, Moody told Mock and Bassett that he did not realize that a man the victim's age had so much strength and that he did not know that it took a man so long to die. He also told them that he did not kill Bell of his own will, that God wanted him to do it, and that he would not have had enough strength to do it on his own.
The fire in Bell's trailer alerted the neighbors and the fire department. Bell's blood-soaked body was found in a south bedroom in his trailer. The sheriff's department was immediately notified, and sheriff's deputies were advised to be on the lookout for the green Volkswagen beetle, which had been observed by Bell's neighbors outside his trailer at the time of the murder, and for the van which belonged to Bell. Within approximately an hour and a half after the murder, Moody, who was driving Bell's van enroute to Jacksonville, was stopped by a deputy sheriff. At the time he was stopped, Moody had a bloodstain on his face and blood on his shirt, pants, belt, and shoes. The blood on his pants was of the same blood type as Bell's. Bassett and Mock, who were in the Volkswagen, were also stopped and detained. A search of the Volkswagen pursuant to a search warrant revealed a bag containing Moody's bloodstained, yellow jacket, a small bag of coins, a display card for an "Old Hickory" household knife, a TG&Y sales slip for the knife, and four paper bags containing $7.10 in coins. The "Old Hickory" household knife was found on the kitchen sink in Bell's trailer.
The medical examiner testified that this knife could have caused the wounds on Bell's body. Bell had been stabbed twenty-seven times  seventeen in the chest and back and ten on the hands. The wounds on Bell's hands were described by the medical examiner as defensive wounds, wounds caused by attempting to take the knife from the killer. Bell's death was caused by *992 the stab wounds, not the fire. The evidence clearly demonstrates that the murder was consummated before Moody set fire to the trailer.
Moody was indicted for the premeditated stabbing murder of Bell. Two psychiatrists found that he was legally sane to stand trial and that he was legally sane at the time of commission of the murder. He appeals his conviction of the premeditated, first-degree, stabbing murder of Bell on several grounds.
He argues that he was deprived of his sixth amendment right to compulsory process of witnesses and his right to present a defense by the trial court's denial of his petition for writ of habeas corpus ad testificandum directed to Bassett who was committed to a state mental hospital in Georgia after having been declared incompetent to stand trial in that state upon the charge of first-degree murder of her mother. The trial court had granted Moody's motion to depose Bassett, but Bassett refused to answer any questions on the basis that she might incriminate herself. The court held a hearing on the motion to compel testimony and motion for habeas corpus ad testificandum to determine whether Bassett's claim of her fifth amendment privilege was valid and whether she was competent to testify. After the hearing, the court denied these motions.
Moody acknowledges that the issuance of a habeas corpus ad testificandum is discretionary with the court, but contends that the trial court abused its discretion. We hold that the trial court did not abuse its discretion and that the denial of Moody's request does not constitute reversible error. We also reject Moody's contention that he was denied due process of the law by the prosecutor's failure to give Bassett immunity. Furthermore, we hold that the trial court's excluding from evidence Bassett's Florida counsel's testimony that, after being released from the Orange County jail, Bassett went to Georgia and killed her mother was entirely proper.
Moody next argues that the court's instructions on murder were misleading and may have caused Moody to be wrongfully convicted of first-degree murder. During the jury charge conference, the court agreed with Moody's counsel that the felony murder instruction should not be given because the evidence was tenuous at best as to whether there was a first-degree felony murder. The court did not give the separate instruction on felony murder, but in giving the definition of first-degree murder, it did include the entire statutory definition of first-degree murder which includes a reference to felony murder.[1] This reference to felony murder in the context of the definition of first-degree murder did not amount to reversible error since, in the present case, there is not only sufficient but also overwhelming evidence of premeditation. See Knight v. State, 394 So.2d 997 (Fla. 1981). The record shows that Moody threatened Bell's life on several occasions prior to February 17, 1977, in order to force Bell to give him money. On the morning of the murder, Moody asked Bell for his van, and when Bell refused, he again threatened him. Moody then went to the store, bought a knife, returned to the trailer, and waited several hours for Bell to return. When Bell returned, he signaled the women and the child accompanying him to go to the bedroom and close the door, and he then proceeded to stab Bell seventeen times in the chest and back while Bell begged for his life and tried to ward off the knife with his hands. The evidence is overwhelming that Moody went to Bell's trailer with the intention *993 of killing him and with the intention of getting Bell's van.
Moody next challenges his conviction on the basis that reversible error was committed when the prosecutor, during voir dire of the prospective jurors, asked the venire certain questions which Moody characterizes as asking the jury to prejudge the credibility of a witness. The prosecutor asked potential jurors whether they would never return a verdict of guilty under any circumstances where the evidence presented was from a witness who was present at the scene of the crime and who was granted immunity by the State. The State urges that this questioning was used to ferret out prejudice and to secure an unbiased jury and that the prosecutor was not asking the potential jurors to predecide the witness's credibility.
The purpose of the voir dire proceeding is to secure an impartial jury, and impartiality requires not only freedom from jury bias against the accused and for the prosecution but also freedom from jury bias against the prosecution and for the accused. Downs v. State, 386 So.2d 788 (Fla.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 238 (1980); Lewis v. State, 377 So.2d 640 (Fla. 1979). See also Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).
The prosecutor's question is unlike the question asked by the prosecutor during the voir dire proceeding in Smith v. State, 253 So.2d 465 (Fla. 1st DCA 1971), which decision is relied upon by Moody to establish reversible error in the present case. We find that the trial court did not commit reversible error in overruling Moody's objection to this question propounded to the venire by the prosecutor. The question did not call for a prejudgment of the case and did not amount to asking the venire to prejudge the credibility of a witness, but rather it was asked to determine the possible bias of any member of the jury venire which might affect the fairness of the trial.
Moody additionally now objects to the propounding of this challenged question to the entire venire rather than to individual jurors. Although at the time of his trial, Florida Rule of Criminal Procedure 3.300(b) provided that collective questioning was proper only when the State and defendant consent,[2] we hold that Moody has failed to demonstrate reversible error on this point. He did not object to this form of questioning in the trial court, and he proceeded in the same manner of collectively questioning the jury. King v. State, 390 So.2d 315 (Fla. 1980), relied upon by Moody in support of his position, does not mandate a different result.
Moody next claims that he was denied his sixth amendment right to present a defense because the court did not give an instruction on the effect of hallucinations on guilt. This standard jury instruction provides:
A person may be legally sane and yet, by reason of mental infirmity, have hallucinations or delusions which cause him to honestly believe to be facts things which are not true or real. The guilt of a person suffering from such hallucinations or delusions is to be determined just as though the hallucinations or delusions were actual facts. If the act of the defendant would have been lawful had the hallucinations or delusions been the actual facts, the defendant is not guilty of the crime.
Fla. Std. Jury Instr. (Crim.) 2.11(b)-2. During the charge conference, Moody merely submitted that this instruction "might be an appropriate charge." This was nothing *994 more than a suggestion and was not a request that the instruction be given. In addition, Moody did not object when the court stated that this instruction would not be given. Furthermore, we would find no error in the court's failure to give this instruction since clearly Moody's act would not have been lawful had the hallucinations or delusions been the actual facts.
In addition to reviewing the record in light of the alleged errors asserted by Moody which are without merit, we have reviewed the evidence pursuant to Florida Rule of Appellate Procedure 9.140(f), and we conclude that no new trial is required. Accordingly, we affirm the conviction for murder in the first degree.
Moody also challenges his sentence of death on several grounds. After the jury rendered an advisory sentence of death, the trial court imposed the sentence of death and made the following findings in support of this sentence:
This Court finds that the Facts and the evidence do not support the Aggravating Circumstances in F.S. 921.141(5)(a), (b), (c), (e) and (g) in that this Capital Felony was not committed by a person under sentence of imprisonment, nor has the Defendant been previously convicted of another capital felony or of a felony involving the use or threat of violence to the person, nor did the Defendant knowingly create a great risk of death to many persons, nor was the capital felony committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, nor was the capital felony committed to disrupt or hinder the lawful exercise of any governmental function or enforcement of laws.
The Court does find, as sufficient Aggravating Circumstances, that the capital felony was committed while the Defendant was fleeing the scene after committing arson in the deceased's trailer, and said flight from the scene was accomplished in the deceased's 1971 Chevrolet Van, as enumerated in F.S. 921.141(5)(d); that the capital felony was committed for pecuniary gain in that the evidence showed that the Defendant had asked the deceased many times for money for his religious cult, and after the homicide a sum of money was missing from the deceased's trailer and was found in the Defendant's possession, F.S. 921.141(5)(f); and that the capital felony was especially heinous, atrocious and cruel in that the deceased had a total of twenty seven (27) stab wounds on his body, both anterior and posterior, on his head, thigh and fingers, 921.141(5)(h).
Turning now to Mitigating Circumstances, the Court finds only that the Defendant has no significant history of prior criminal activity, in that he has never been arrested nor convicted of any offense, according to his Mother's testimony in Court today at the Advisory Sentence Proceedings, F.S. 921.141(6)(a). The Court finds inapplicable Subsections (b) through (g) of F.S. 921.141(6) in that the evidence does not show that the capital felony was committed while the Defendant was under the influence of extreme mental or emotional disturbance, nor that the victim was a participant in the Defendant's conduct or consented to the act, nor that the Defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor, nor that the Defendant acted under extreme duress or under the substantial domination of another person, nor that the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, nor his age at the time of the crime is in mitigation since he was born October 29, 1941, making his age 35 at the time of the crime.
Upon consideration, it is the finding and conclusion of this Court that the Sentence of Death is justified, since the inescapable conclusion is that sufficient Aggravating Circumstances exist in the facts and evidence to justify the Death Penalty. The murder of the victim by the Defendant was for pecuniary gain, and the manner in which it was committed was extremely wicked, shockingly evil *995 and vile, and was designed to inflict a high degree of pain with utter indifference for the pain, suffering and ultimate death of the victim. The Court therefore specifically finds that sufficient Aggravating Circumstances exist, and that there are insufficient Mitigating Circumstances to outweigh the Aggravating Circumstances.
The trial court's finding of the aggravating circumstances that this capital felony was atrocious, heinous, or cruel and that it was committed for pecuniary gain are entirely appropriate as evidenced by the record before us. We agree, however, with Moody's contention that the aggravating circumstance that "the capital felony was committed while the defendant was fleeing the scene after committing arson in the deceased's trailer" is not supported by the record. It is clear from the record that the arson was committed after Bell was killed. The knife which the State urged to be the murder weapon and which the medical examiner testified was consistent with the wounds in Bell's body was found on a white cloth on the counter in the kitchen of Bell's trailer. When the knife was picked up, it left a definite impression on the cloth due to the fact that the cloth was soot stained and smoke and heat damaged from the fire. Underneath the knife, there was a clear outline of the blade of the knife on the cloth which indicated that the knife had been cleaned and placed there before the fire.
Moody also contends that the trial court failed to consider the evidence of his mental and emotional problems in mitigation of the death sentence. He maintains that the evidence demonstrated the statutory mitigating circumstances that his ability to appreciate the criminality of his conduct was substantially impaired, that he was under the influence of extreme mental or emotional disturbance, and that he acted under extreme duress. He relies on Athena Mock's testimony that he had been deeply involved in religion for several years and that he believed that God spoke to him and told him what to do as the basis for his contention. The State responds that it was within the province of the trier of fact to weigh the evidence and to determine whether the evidence supported the existence of these factors. We agree with the State and hold that the findings of the trier of fact that the evidence does not show these statutory mitigating factors should not be disturbed. See Lucas v. State, 376 So.2d 1149 (Fla. 1979). We also approve the trial court's determination that Moody's age (35) at the time of the commission of the crime is not a mitigating factor.
We do not agree with Moody's assertion that the trial court's instructions to the jury limited its consideration of mitigating factors to only those which are statutorily enumerated. The jury was given the standard jury instruction as to mitigating factors which we have held does not unconstitutionally limit the jury's consideration of mitigating factors to those which are statutorily enumerated. Peek v. State, 395 So.2d 492 (Fla. 1980); see also Songer v. State, 365 So.2d 696 (Fla. 1978), cert. denied, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979).
It is not clear, however, from the trial court's sentencing order that it considered nonstatutory mitigating circumstances. Moody presented evidence of the personality change he underwent following his return from combat in Vietnam and of his religious obsession. We are unable to discern from the trial court's order whether it considered these factors as nonstatutory mitigating circumstances.
Since the trial court erroneously considered an aggravating circumstance not supported by the evidence, since there was a valid statutory mitigating circumstance, and since the trial court may not have considered nonstatutory mitigating factors, we set aside the sentence of death and remand to the trial court to make any additional findings it may deem appropriate and to reweigh the aggravating and mitigating circumstances.
Moody additionally points out that the trial court apparently thought that it did not have authority to order a presentence *996 investigation report when it denied Moody's request that the court order one. This appears from the following statement in the record made by the court when it denied the request. The court said, "The motion for PSI is denied. There is no statutory authority for that, and this matter will proceed to sentencing at three thirty this afternoon." Although the trial court was not required by Florida Rule of Criminal Procedure 3.710 to order a presentence investigation before sentencing Moody, it had the discretion to order one. Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979); Thompson v. State, 328 So.2d 1 (Fla. 1976). See also In re Florida Rules of Criminal Procedure, Rule 3.710, 362 So.2d 655 (Fla. 1978). On remand, the trial court should exercise its discretion and either grant or deny the request for a PSI.
Finally, we reject Moody's challenges to Florida's death penalty statute, all of which he concedes have already been expressly or impliedly rejected by this Court.
Accordingly, Moody's conviction is affirmed, and this cause is remanded for resentencing by the trial court without an additional jury recommendation.
It is so ordered.
ADKINS, BOYD, OVERTON and SUNDBERG, JJ., concur.
McDONALD, Justice, concurring in part and dissenting in part:
I would remand with instructions to impose a life sentence.
NOTES
[1] The court instructed:

You are further instructed that murder in the first degree is the unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of or in the attempt to perpetrate any of the following crimes: Arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, or which resulted from the unlawful distribution of heroin by a person over the age of 18 years when such drug is proven to be the proximate cause of the death of the user.
[2] This rule has since been amended to permit collective questioning without consent. Florida Rule of Criminal Procedure 3.300(b), effective January 1, 1981, now provides:

Examination. The court may then examine each prospective juror individually or may examine the prospective jurors collectively. Counsel for both State and defendant shall have the right to examine jurors orally on their voir dire. The order in which the parties may examine each juror shall be determined by the court. The right of the parties to conduct an examination of each juror orally shall be preserved.