808 So.2d 92 (2001)
Paul H. EVANS, Appellant,
v.
STATE of Florida, Appellee.
No. SC96404.
Supreme Court of Florida.
December 13, 2001.
Rehearing Denied February 12, 2002.
*95 Carey Haughwout, Public Defender, and Gary Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Paul H. Evans for the March 24, 1991, killing of Alan Pfeiffer. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Evans' conviction and sentence of death.

FACTS
The trial record establishes the following facts. This is a murder-for-hire case involving four coconspirators: Evans, who was nineteen at the time of the crime; Sarah Thomas, Evans' girlfriend; Donna Waddell, Evans' and Thomas's roommate; and Connie Pfeiffer, the wife of the victim. At trial, the sequence of events regarding the murder, and Evans' role in the murder, were provided predominantly by Thomas and Waddell, who both testified on behalf of the State.[1] Waddell signed a deal with the State in which she agreed to plead guilty to second-degree murder in exchange for giving a sworn statement explaining her involvement in the murder and agreeing to testify in any proceeding. Thomas was never charged with any crime. The evidence at trial demonstrated that the victim and Connie had a "rocky" marriage, and that each were dating other people while they were married. A few weeks before the murder, Connie approached several individuals about killing *96 her husband, but each person refused. Connie then asked Waddell if she knew anyone who would be willing to kill her husband, and Waddell suggested that Evans might be willing to commit the murder. Thomas testified at trial that Evans told her that he would kill Alan in exchange for a camcorder, a stereo, and some insurance money.
Waddell stated at trial that she, Evans, Connie, and Thomas all collaborated to come up with the plan to kill the victim. Testimony also established that Evans initiated the plan to commit murder and that he was the "mastermind" behind the plot. Pursuant to the agreement, on Saturday morning, March 23, 1991, Waddell, Connie, and Evans all participated in arranging the Pfeiffers' trailer to make it look like a robbery had taken place. Waddell testified that it was Evans' idea to stage the robbery. They stacked electronic equipment near the back door. During the staging of the robbery, Evans wore gloves.
After the trailer was arranged, Waddell and Evans went to her parents' house to steal Waddell's father's gun. Evans broke into the house through a window to steal the gun and also stole a jar of quarters from Waddell's father's bedroom. Waddell and Evans disposed of the jar, keeping the quarters, and then Waddell, Evans, and Thomas went to test-fire the gun.
Waddell testified that after firing the gun, she, Evans, and Thomas went back to the trailer to go over the alibi with Connie, and Evans told the other three what to say. Waddell stated that Evans explained that he was going to hide behind furniture and shoot Alan when he entered the trailer.
Waddell testified that she, Evans, and Thomas were at the fair that evening but left the fair and arrived at the trailer at dusk. They went in the front door. Evans had a bag containing the gun and dark clothing. Waddell and Thomas left Evans in the trailer, locked the door, and went back to the fair.[2] They paid for the fair with the quarters stolen from Waddell's parents' house.
Thomas testified that she and Waddell paid with quarters to avoid having their hands stamped, so it would not look like they left the fair and later returned. Thomas also testified that she and Waddell stayed at the fair for approximately one to two hours before returning to the trailer. According to Thomas, it was Evans who told them to wait at the fair before returning to the trailer.
Between 7 p.m. and 7:15 p.m. that evening, Alan's girlfriend, Linda Tustin, met Alan at the store where he worked, She observed that Alan was agitated and talking on the phone to Connie. When Alan got off of the phone, he told Tustin that "his wife and her biker friends were going to clean him out." He left work to drive back to the trailer at approximately 7:30 p.m. Alan worked thirty minutes away from the trailer.
Although there is some dispute between the testimony of Waddell and Thomas as to the following sequence of events,[3] both witnesses agreed that they returned to the pickup site, where Evans got into the back *97 of the car and said, "It's done." Waddell stated that Evans told her that he turned the stereo up loud so that nobody would hear the gunshots, then hid behind some furniture and shot Alan when he came into the trailer. Leo Cordary, one of the Pfeiffers' neighbors, testified that he heard gunshots between 8 p.m. and 8:30 p.m., but did not recall anyone running from the trailer.
Waddell also testified that Evans did not want to tell her or Thomas too much about the murder so that they would not be able to tell the authorities anything if they were caught. Evans told Waddell, "Just stick to the story that we were at the fair and just we were all together all night at the fair." Thomas and Waddell both testified that they disposed of the gun in a canal near Yeehaw Junction.[4] They then went back to the fair to meet up with Connie.
Although there is a dispute in the testimony of Waddell and Thomas as to the timing and specific circumstances, both women stated that Evans tried to burn his pants in the bathtub following the murder.[5] Thomas testified that shortly after the murder, Evans took the camcorder apart and threw the pieces in a dumpster because he was afraid this could implicate him. Moreover, Waddell testified that she, Thomas, and Evans smashed the television and that Thomas and Evans disposed of the pieces.
In the early morning on March 23, 1991, the Vero Beach Police Department was summoned to the trailer that the victim shared with Connie, due to a complaint of loud music. The police found the south door of the trailer ajar and, upon entering, discovered the victim's body on the living room floor. The police noticed that the interior of the residence was illuminated by a dim kitchen light. Moreover, the police discovered that the dining area paddle fan light had been disabled. There were no signs of a forced entry or a struggle within the trailer, but the trailer was in a state of disarray, with electronic equipment and other items stacked near the south door. The victim was wearing two gold chains and had $48 in his pocket when the police found him. Moreover, the police found the victim's life insurance policies which were worth approximately $120,000 lying on the table. Each policy listed Connie as the beneficiary.
The police also discovered a marijuana roach on the end table in the living room and found a crack pipe and roach clip on the bedroom dresser. The roach in the living room had lipstick on it, but the police never sent it for DNA analysis. A television, camcorder, and VCR were reported missing from the trailer and never recovered. These items were rented from Alan's place of work.
Three bullets were recovered from the victim, one from his spine, and two from his head. The testimony at trial identified the bullets as .38 special Nyclad bullets that were fired from the same gun, and *98 that the shots likely occurred from a distance of more than two feet away. Moreover, spent casings found in Waddell's father's home were consistent with those which would have held the Nyclad bullets.
The police did not speak with Connie until she arrived at the station the following afternoon. Detective Elliot testified at trial that Connie was uncooperative throughout the investigation. Connie told Detective Elliot that she was at the fair with Evans, Waddell, and Thomas on the evening of the murder. Waddell stated that they stayed at the fair "long enough to be seen." Waddell, Thomas, and Evans each confirmed this alibi.
Thomas broke up with Evans about a month after the murder. Evans told her that he did not actually kill Alan, but that he had three African-American men do it. Moreover, Evans called Thomas some time after the murder and told her to "stick to the story."
Following the murder of her husband, Connie moved out of Vero Beach and purchased a horse farm near Ocala worth approximately $120,000, which was the same amount as the life insurance proceeds. Although Waddell testified that she never received anything for the death of Alan, Waddell acquired a taxi company some time after the murder. About three years after the murder, Waddell met with Evans. Evans told Waddell that she better keep quiet or his "old family members [were] going to kill" her. Evans also told Waddell that the person who killed Alan was dead. Evans told Waddell that he went and got the gun, took it apart, and took a bus to the woods in Ocala to dispose of the pieces. At the end of the conversation, Evans threatened to kill Waddell and her son if she talked to the police.
Ultimately, the case grew cold and was closed. However, in 1997, the Vero Beach Police Department reopened the case and Detective Daniel Cook focused his investigation upon Evans, Connie, Waddell, and Thomas. Thomas was the first suspect the police interviewed. Thomas explained the events surrounding the homicide and agreed to wear a wire and contact Waddell. At the meeting between Thomas and Waddell, Thomas stated: "We helped." Waddell responded: "I know. I think about it every day." The police arrested Waddell and, after the police showed Waddell the statement that she gave to Thomas, Waddell agreed to cooperate with the police and provide a statement. Based on Thomas and Waddell's cooperation, Connie and Evans were arrested for their alleged involvement in the murder.
Although Evans did not testify at trial,[6] the State presented the statement Evans made to Sergeant Daniel Brumley on March 28, 1991, in which he stated that he was at the fair the entire night of March 23. With regard to Alan's death, Evans told Sergeant Brumley: "I know it was none of us. I don't care what nobody says. We were all together. One thing, Connie couldn't do a thing (sic) like that. Just the nature of her, how she is."
The jury found Evans guilty of first-degree murder and the case proceeded to the penalty phase. The defense presented testimony establishing that Evans was a hyperactive child and was placed on Ritalin when he was six years old. His parents divorced at that time, and between 1978 and 1984, his father saw Evans only once because Evans' father was in the military. In late 1983, Evans' mother asked Evans' father to take custody of both Evans and his younger brother, Matthew, because of the children's behavioral problems. Shortly thereafter, Evans' father received news *99 that Evans had accidentally shot Matthew while they were playing. Evans' parents testified at the penalty phase that Evans went through a "very emotional traumatic time" after the shooting. Although there was testimony from family members regarding the effect that the shooting incident had on Evans and the treatment he subsequently received, there was no expert testimony regarding any specific mental illness or impairment from which Evans may have suffered.
Dr. Gregory Landrum, a clinical and forensic psychologist, testified that Evans' intelligence was in the high average to superior range. Moreover, Dr. Laurence Levine, a psychologist who performed a number of psychological and neuropsychological tests on Evans, stated that Evans had above average intelligence and was an avid reader. Finally, Evans' mother and Dr. Levine both testified to Evans' artistic ability, with Dr. Levine stating that Evans was a "stupendous" artist.
Drs. Landrum and Levine both testified that Evans would respond well to a structured environment and would adapt well to prison. However, Dr. Levine stated on cross-examination that Evans' record at all of the institutions he attended was replete with disciplinary problems. Deputies Carl Lewis and Gregory George, who were corrections officers at the Indian River County Jail, testified that Evans had been a good prisoner and had not exhibited any disciplinary problems. Finally, Paul George, a Jehovah's Witness who conducted bible study in prison with Evans, stated that Evans has a sincere belief in God.
Following the penalty-phase proceedings, the jury recommended the imposition of the death penalty by a vote of nine to three. The trial court found the following in aggravation: (1) Evans had committed the crime for pecuniary gain (great weight); and (2) the murder was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification ("CCP") (great weight). The trial court found only one statutory mitigator: Evans' age of nineteen when he committed the murder (little weight).[7]
In addition, the trial court found and gave weight to the following nonstatutory mitigators: (1) Evans' good conduct while in jail (little weight); (2) Evans' good attitude and conduct while awaiting trial (little weight); (3) Evans had a difficult childhood (little weight); (4) Evans was raised without a father (little weight); (5) Evans was the product of a broken home (little weight); (6) Evans suffered great trauma during childhood (moderate weight); (7) Evans suffered from hyperactivity and had a prior psychiatric history and a history of hospitalization for mental illness (moderate weight); (8) Evans was the father of two young girls (very little weight); (9) Evans believes in God (very little weight); (10) Evans will adjust well to life in prison and is unlikely to be a danger to others while serving a life sentence (very little weight); (11) Evans loves his family and Evans' family loves him (very little weight). The trial court found that Evans failed to establish that he was immature, and therefore gave this proposed mitigator no weight. Moreover, the court refused to recognize Evans' artistic ability as a mitigating circumstance and therefore gave this no weight. Concluding that the aggravation *100 outweighed the mitigation, the trial court imposed the death penalty.
On appeal, Evans raises fourteen claims.[8] Although Evans does not raise the issue of sufficiency of the evidence on appeal, we have independently reviewed the evidence in this case and we conclude that the evidence is sufficient to support the murder conviction. See Rodriguez v. State, 753 So.2d 29, 43 (Fla.2000).

GUILT PHASE ISSUES

1. Preindictment Delay

In Evans' first claim on appeal, he asserts that the trial court erred in denying his motion to quash the indictment or dismiss the murder charge because of preindictment delay. The murder occurred in March 1991, but Evans was not indicted until August 1997. Evans maintains that this delay of more than six years has prejudiced him because witnesses were lost and evidence could not be examined or admitted at trial.
The trial court denied the motion after hearing oral argument from both the defense and the State, finding that Evans had failed to demonstrate actual prejudice by the delay in the indictment. We agree and conclude that no due process violation occurred because Evans has failed to make the threshold showing of actual prejudice in this case.
In Rogers v. State, 511 So.2d 526, 531 (Fla.1987), this Court explained the procedure a defendant must follow when the defendant asserts a due process violation based on preindictment delay:
When a defendant asserts a due process violation based on preindictment delay, he bears the initial burden of showing actual prejudice.... If the defendant meets this initial burden, the court then must balance the demonstrable reasons for delay against the gravity of the particular prejudice on a case-by-case basis. The outcome turns on whether the delay violates the fundamental conception of justice, decency, and fair play embodied in the Bill of Rights and fourteenth amendment.
The contention of prejudice must be based on more than mere speculation, and must be supported by substantial evidence. See id. Thus, in Rogers, the Court rejected the defendant's claim of actual prejudice from the State's delay of nearly a year where the defendant claimed that the memories *101 of those familiar with the murder had faded and two alibi witnesses had allegedly disappeared. See id. The Court concluded that these claims were based on "mere speculation unsupported by any substantial evidence." Id.
In Scott v. State, 581 So.2d 887, 892-93 (Fla.1991), this Court held that the defendant was actually prejudiced by a delay in prosecution of seven years and seven months where the record established the following: First, the defendant was no longer able to corroborate his alibi that was initially checked out by the police; second, the defendant was unable to present certain witnesses in his defense because the witnesses had died in the interim; third, investigative reports, statements, and evidence that may have been helpful to the defendant were lost as a result of the delay and because of changes in police personnel and administrations; and finally, the reliability of hair comparison evidence was adversely affected by the delay and the manner in which the comparison was made. See id.
In this case, although Evans made a particularized claim that key witnesses had become unavailable to the defense, and also made a generalized claim that the physical evidence was so stale that it was of no evidentiary value, Evans did not submit any evidence to support these claims. We conclude that the mere assertion that particular witnesses helpful to the defense are unavailable, absent record evidence, precludes a finding of actual prejudice under these circumstances. Because we find that Evans has failed to demonstrate actual prejudice in this case, we need not "balance the demonstrable reasons for the delay against the gravity of the particular prejudice." Rogers, 511 So.2d at 531. Accordingly, we deny relief on this claim.

2. Alleged Error under Anderson v. State, 574 So.2d 87 (Fla.1991)

Evans also claims that reversal is required because the State's case at the time of the indictment, as set out in the "Complaint Affidavit," and the State's case at trial were materially different from each other, relying upon this Court's decision in Anderson v. State, 574 So.2d 87 (Fla.1991). In response, the State maintains that although Evans requested the grand jury testimony, Evans did not raise the alleged variances between the complaint and the trial testimony at trial, and, therefore, this claim is unpreserved. Furthermore, the State contends that even if the Court decides to reach the merits of this claim, Evans has failed to show that the grand jury testimony was either perjured or material.
We agree with the State that the matter is unpreserved. Moreover, we do not find that Evans' allegation amounts to error, let alone fundamental error. In Anderson, the defendant claimed that the trial court erred in failing to dismiss the indictment when a witness admitted that her grand jury testimony differed from her trial testimony. 574 So.2d at 90. The defendant contended that because the State knew prior to trial that the witness's grand jury testimony was perjured and did nothing to correct the testimony, the trial court should have dismissed the indictment. See id. This Court held that "due process is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel, and the grand jury." Id. at 91 (emphasis supplied). However, the Court found that although the testimony was false in part, "it was not false in any material respect that would have affected the indictment." Id. at 92. Moreover, the Court explained *102 that this was not a case where it was faced with deliberate subornation, because the State did not knowingly present false testimony to the grand jury. See id.
In this case, Evans does not maintain that the State deliberately presented false testimony to the grand jury, and there is no indication that the State did present false testimony to the grand jury. Rather, Evans contends that variances between the complaint and the trial testimony necessitate a reversal. In Brookings v. State, 495 So.2d 135, 137 (Fla.1986), a case similar to this case, the defendant claimed that he was entitled to an inspection of the grand jury testimony due to certain inaccuracies and conflicts between two witnesses' depositions and the original criminal affidavit. This Court rejected the defendant's claim, explaining "there is no pretrial right to inspect grand jury testimony." Id. Although the defendant enumerated several instances of alleged inconsistencies between the grand jury testimony and the witnesses' depositions, this Court found "that appellant's counsel, through cross-examination at trial of both [witnesses], was able to direct the jury's attention to any purported inconsistencies between the witnesses' trial testimony and their prior depositions, thus obviating any need for resort to the grand jury testimony." Id. at 138. Therefore, based on this Court's decision in Brookings, we reject Evans' claim that reversal is justified based on alleged inconsistencies between the complaint and the trial testimony.

3. Foundation for Testimony Concerning Cannabanoids

In Evans' third claim, he contends that the trial court erred in sustaining the State's objection to the defense's questioning of a medical examiner regarding tests revealing cannabanoids in the victim's blood on the ground that the defense failed to lay a proper foundation for the results of the tests. We hold that the trial court did not abuse it discretion in sustaining the State's objection because Evans failed to lay the proper predicate for the questioning of the medical examiner.
"Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion." Ray v. State, 755 So.2d 604, 610 (Fla.2000) (citing Alston v. State, 723 So.2d 148 (Fla.1998)). Evidence Code section 90.704, Florida Statutes (2001), provides: "The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence."
The defense relies upon this Court's opinion in Capehart v. State, 583 So.2d 1009 (Fla.1991), for the proposition that a doctor need not perform blood tests in order to testify about the results. However, the Capehart opinion required that a party lay a proper foundation before introducing medical testimony. Id. at 1012-13. In Capehart, the Court concluded that the State laid a proper foundation for a medical examiner to testify regarding the cause of the victim's death and the condition of the victim's body, even though the medical examiner did not perform the autopsy and the autopsy report was not admitted into evidence. 583 So.2d at 1012. The Court explained that the State had laid a proper foundation because the State "properly qualified [the examiner] as an expert without objection and ... she formed her opinion based upon the autopsy report, the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case." Id. at 1012-13.
*103 In contrast to Capehart, in this case, Evans never attempted to establish that the toxicology report was of the type reasonably relied upon by Dr. Bell or that Dr. Bell formed his opinion based upon the toxicology report. Therefore, we conclude that Evans failed to establish a proper foundation for Dr. Bell to testify regarding the cannabanoids found in the victim's blood and that the trial court did not abuse its discretion in refusing to allow this testimony at trial.

4. Limitation on the Cross-Examination of Detective Brumley

In Evans' fourth point, he asserts that the trial court erred in limiting cross-examination of Detective Brumley to exclude hearsay after the State allegedly opened the door by eliciting hearsay statements on direct examination. During the State's direct examination of Detective Brumley, he testified about the police investigation of the Pfeiffers' trailer after the murder, stating: "We got out more detectives to start neighborhood canvasses and backgrounds on the deceased," and "we followed up whatever leads we had from the neighborhood canvass and followed up the background on the deceased and the financial aspect of him." Moreover, the following inquiry took place during the State's direct examination of Detective Brumley:
Q: Now, in regards to the overall crime scene, and we've already talked about that as far as the investigation, how did y'all proceed? Or how did you proceed?
A: Well, we followed up whatever leads we had from the neighborhood canvass and followed up thehad a detective follow up the background on the deceased and the financial aspect of him.
The defense did not object to the State's question. During the defense's cross-examination of Detective Brumley, the State made a motion in limine, which the trial court granted, to prevent the defense from eliciting from Detective Brumley whether or not there were any other individuals who heard a gunshot at 10:30 p.m., on the grounds that it would constitute a hearsay statement.
We hold that the State's questioning of Detective Brumley on direct examination neither constituted hearsay nor "opened the door" to allow the defense to ask about specific leads on cross-examination. Section 90.801(1)(c), Florida Statutes (2001), defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In this case, Detective Brumley stated several times that the police followed up leads and had a detective follow up on the victim's background and finances. However, this testimony does not constitute a "statement ... offered in evidence to prove the truth of the matter asserted." Rather, Detective Brumley provided testimony concerning the police department's conduct after the investigation. Even under the definition of a "statement" that provides "nonverbal conduct of a person if it is intended by the person as an assertion," section 90.801(1)(a)2., Detective Brumley's statements do not qualify as hearsay. Detective Brumley did not state with specificity who he or other detectives spoke to in following up on leads. Moreover, Detective Brumley did not allude to any conversations he or other detectives had with leads or how these leads contributed to the investigation. Therefore, we conclude that Detective Brumley's testimony did not constitute hearsay.
Accordingly, we hold that the trial court did not err in granting the State's motion in limine to exclude the defense from asking about whether any of the leads heard *104 gunshots at 10:30 p.m. on the night of the murder. The defense concedes that its inquiry as to whether any leads heard gunshots at 10:30 p.m. constitutes hearsay. However, the defense contends that because the State "opened the door" by eliciting hearsay on direct, the defense was entitled to ask follow-up questions that elicited hearsay.
This Court rejected a similar contention in Crump v. State, 622 So.2d 963 (Fla. 1993). In Crump, the trial court limited the defendant's questioning of a detective's testimony concerning interviews the detective conducted during the investigation. Id. at 969. Over the State's objection, the trial court permitted the defendant to question the detective about whether the police interview focused on other suspects during the investigation. See id. However, the trial court refused to allow the detective to testify about the substance of his interview. See id. The defendant argued that because the detective's interviews tended to show that another suspect may have killed the victim, the trial court improperly limited this evidence. See id. This Court rejected the defendant's argument, explaining:
The evidence here concerning the detective's interviews is hearsay that does not fall within one of the hearsay exceptions. The substance of the interviews does not constitute reverse Williams rule evidence because it would not have been admissible had the other suspect been on trial for the present offense. Thus, the trial court properly excluded these statements.
Id.
Therefore, we conclude that the State did not "open the door" to the defense's eliciting of hearsay on cross-examination in this case. Cf. Keen v. State, 775 So.2d 263, 273-76 (Fla.2000) (explaining that mistrial should have been granted where inference from detective's hearsay testimony was that the police investigation had produced evidence that defendant was the murderer).
Finally, we reject Evans' reliance upon Sweet v. State, 693 So.2d 644 (Fla. 4th DCA 1997), Williams v. State, 689 So.2d 393 (Fla. 3d DCA 1997), and Johnson v. State, 653 So.2d 1074 (Fla. 3d DCA 1995), for the proposition that the "rule of completeness" demands that Evans be allowed to elicit hearsay in cross-examination based upon the statements made in the direct examination. The purpose of the "rule of completeness" is "to avoid the potential for creating misleading impressions by taking statements out of context." Williams, 689 So.2d at 398 (quoting Larzelere v. State, 676 So.2d 394, 401 (Fla.1996)). Moreover, "[t]he admission of such testimony is subject to a judicial determination that the statements `"in fairness ought to be considered contemporaneously" with the introduction of the partial statements.'" Id. at 398 (quoting Larzelere, 676 So.2d at 402); see § 90.108(1), Fla. Stat.; Ramirez v. State, 739 So.2d 568, 580 (Fla.1999).
In this case, it does not appear that the jury was misled or left confused by Detective Brumley's testimony. Detective Brumley did not testify about a partial statement a specific witness gave him that required further clarification. Further, Detective Brumley did not testify about the results or actions he took in response to the canvass. In fact, on cross-examination the defense asked extensive questions about the canvassing by the police, including which specific leads the police followed up and which leads went into the police report. The trial court precluded the defense from eliciting hearsay only with regard to what a single lead's actual statements were. Therefore, we reject Evans' fourth claim on appeal.

*105 5. Individual Voir Dire

Evans next contends that the trial court's closure of individual voir dire to his parents violated his right to a public trial under the Sixth Amendment of the United States Constitution and article 1, section 16 of the Florida Constitution. Evans did not object to this issue and we hold that any closure during voir dire was partial in nature.
The trial court in this case utilized the hearing room rather than the courtroom for individual voir dire because it did not want to contaminate the jury pool by having a potential juror state his or her knowledge about the case, which was the reason for the second mistrial in this case.[9] Moreover, the record in this case indicates that throughout the individual voir dire questioning, both members of the press and a student "shadowing" one of the defense attorneys were allowed to observe the proceedings.
Therefore, given the limited nature of the exclusion of Evans' parents, the fact that other members of the public were allowed to observe individual voir dire, and the fact that Evans did not object when the trial court stated that there was not enough room in the hearing room for Evans' parents, we conclude that there is no reversible error.

6. Voir Dire Examination Regarding Testimony of Coconspirators

Evans also asserts that the State engaged in improper questioning during group voir dire regarding the subject of a plea bargain. The State counters that it was not preconditioning jurors or lending credibility to its witnesses, but rather was attempting to find those jurors with biases. We agree with the State and conclude that the trial court did not abuse its discretion in allowing the State to interrogate the potential jurors about whether they harbored any biases against a witness who had accepted a plea bargain.
"Whether a trial judge should have allowed interrogation of jurors on specific subjects is reviewed under an abuse of discretion standard." Davis v. State, 698 So.2d 1182, 1190 (Fla.1997) (citing Farina v. State, 679 So.2d 1151, 1154 (Fla.1996)). This Court has explained: "The purpose of the voir dire proceeding is to secure an impartial jury for the accused. Consequently, the possible bias of a member of the jury venire which ... might affect the fairness of the trial of the accused, is clearly a proper ground of inquiry during this proceeding." Lewis v. State, 377 So.2d 640, 642-43 (Fla.1979) (citations omitted).
The questioning challenged by Evans in this case is similar to the questioning challenged in Moody v. State, 418 So.2d 989, 993 (Fla.1982). In that case, the prosecutor asked prospective jurors during voir dire "whether they would never return a verdict of guilty under any circumstances where the evidence presented was from a witness who was present at the scene of the crime and who was granted immunity by the State." Id. The defendant claimed that this question asked the jurors to prejudge the credibility of a witness. See id. This Court rejected the defendant's argument because "[t]he question did not call for prejudgment of the case and did not amount to asking the venire to prejudge the credibility of a witness, but rather it was asked to determine the possible bias *106 of any member of the jury venire which might affect the fairness of the trial." Id.
In this case, the State's case against Evans strongly depended upon the jury believing the testimony of Waddell, who made a plea bargain. Therefore, it was proper for the State to inquire into whether any of the potential jurors would harbor any biases against a witness who had accepted a plea bargain. Moreover, when several of the potential jurors asked the State specific questions regarding the plea bargain, the State did not bolster Waddell's credibility, but instead explained that the jury should wait to view the evidence in the case. Therefore, we conclude that the trial court did not abuse its discretion in allowing the State to question jurors about possible bias during voir dire.

7. Motion for Statement of Particulars

Evans next asserts that the trial court erred in denying his motion for a statement of particulars. At trial, Evans' motion for statement of particulars sought to commit the State to either a theory that Evans was the shooter or that he was the principal, arguing that the State should not be allowed to present alternative theories that Evans was the shooter or a principal. Specifically, Evans contended that the State "must specify which theory of prosecution it intends to proceed under to obtain a conviction for First Degree Murder in order to permit the Defendant to properly prepare and present a defense." The trial court denied the motion.
The State's theory of the case was that, in fact, Evans was the shooter and the trial court so found in its sentencing order. Evans does not contend on appeal that there was not substantial competent evidence to support the conclusion that Evans was the shooter. During closing argument, the State did argue: "Six of you may agree that he is the actual shooter. Six of you may agree he's a principal. Under either theory he is guilty of first degree murder." Evans did not object to this statement nor did he request a jury instruction or special verdict form that would have required jury unanimity on whether he was the shooter or the principal.
On appeal, Evans raises for the first time that the State's use, in a capital case, of two mutually exclusive factual theories so that the jury may be divided as to the elements of the crime violates both the state and federal constitutions based on the United States Supreme Court's decisions in Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), and Richardson v. United States, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). We conclude that this claim was not preserved.

8. Guilt Phase Closing Argument

Evans claims that the State made several improper comments during its guilt phase closing argument. Although Evans concedes that defense counsel did not object to most of the alleged improper comments, Evans contends that the cumulative effect of the objected-to and unobjected-to comments deprived Evans of a fair penalty phase hearing.
As for the objected-to comments, Evans argues that the State impermissibly commented upon facts not in evidence at several points during closing argument. However, Evans only objected to the following argument by the State regarding what occurred during the shooting:
Alan gets shot in the back. He turns and begins to fall. Look at his feet. If you stand him right back up, he's back in front of the entertainment center. He falls up against the loveseat. The shooter, as he's coming up at Alan falling, shoots again, hits him on the top of the head. There's a substance here (indicating) *107 consistent with blood. Alan falls. The shooter comes out from that corner
Evans objected to the prosecutor's depiction of the murder and the trial court overruled the objection. We conclude that the State's comments constituted reasonable inferences from the evidence presented at trial. At trial, Dr. Michael Bell testified that although the cause of death was multiple gunshots, in particular two gunshots to the head, he could not determine which gunshot occurred first. However, there was testimony indicating that the substance on the loveseat was consistent with blood. Moreover, given the positioning of the body, the prosecution's theory of the bullet entries appears to be a logical inference.
With regard to the unobjected-to statements made by the State regarding facts not in evidence, we conclude that the majority of the State's comments constituted permissible inferences from the evidence presented at trial. Having carefully reviewed the entire closing argument in light of the unobjected-to arguments that Evans contends were improper, we reject Evans' claim that any of these errors, either by themselves or collectively, rise to the level of fundamental error. Moreover, reviewing both the objected-to and unobjected-to errors, we conclude that the Evans is not entitled to a new guilt phase proceeding, as he was not deprived of a fair guilt phase proceeding. Accordingly, we deny relief on Evans' closing argument claims.

PENALTY PHASE ISSUES

1. Closing Argument Errors

Evans asserts that the State made four improper arguments during its penalty phase closing argument. However, Evans failed to object to any of the arguments the State made during its closing. We find Evans' claims barred because they were not preserved for appellate review, see Fernandez v. State, 730 So.2d 277, 282 (Fla.1999), and we find that none of the alleged errorseither by themselves or cumulativelyrise to the level of fundamental error.

2. Mitigating Evidence

Evans claims that the trial court erred in rejecting Evans' immaturity and artistic ability as nonstatutory mitigation in this case. The trial court's sentencing order provides in pertinent part:
9) The defendant was immature at the time of the homicide.
The defendant has failed to establish that he was in fact immature at the time of the murder. This court does not give this any weight.
. . . .
13) The defendant has artistic ability.
The defendant presented drawings he made in jail to show the defendant's positive prognosis for prison life. This court does not recognize this as a mitigating factor and gives it no weight.
As this Court recently explained in Merck v. State, 763 So.2d 295, 298 (Fla.2000):
The trial court, in considering mitigating evidence, must determine whether the facts alleged in mitigation are supported by the evidence. A trial court is obligated to find and weigh all valid mitigating evidence available in the record at the conclusion of the penalty phase. Evidence is mitigating if, in fairness or in the totality of the defendant's life or character, it may be considered as extenuating or reducing the degree of moral culpability for the crime committed.
(Citations omitted.) With regards to Evans' alleged immaturity, no testimony on *108 this potential mitigator was presented during the penalty phase. Moreover, the trial court expressly addressed Evans' maturity in its sentencing order in considering Evans' age as a statutory mitigator, stating:
The defendant was nineteen years old at the time of the murder. The defendant was legally an adult. The defendant was the "mastermind" in planning, organizing, and carrying out the murder of Alan Pfeiffer. The defendant was living on his own with his co-conspirators, Donna Waddell and Sarah Thomas, when the murder was planned and carried out. Dr. Gregory Landrum testified that the defendant was functioning on an above average intelligence level. The defendant planned, prepared, and shot the victim in a manner consistent with a mature adult. The defendant committed the killing like a professional executioner, leaving no finger prints or physical evidence that could connect him to the murder scene. This court has considered the mitigating circumstance and gives it little weight.
We conclude that the trial court's determination that Evans failed to establish that he was immature at the time of the murder is supported by competent, substantial evidence. See Alston v. State, 723 So.2d 148, 162 (Fla.1998).
With regard to Evans' artistic ability, the record establishes that Evans satisfied his burden of demonstrating that he has artistic ability by a preponderance of the evidence. Both Evans' mother and Dr. Laurence Levine testified during the penalty phase that Evans was a good artist, and there was no testimony to rebut this fact. The trial court's sentencing order reflects that although it found evidence that Evans had artistic ability, it concluded that this was not a relevant mitigating factor. Trial courts have recognized that artistic ability may be considered a valid mitigating factor in deciding whether the death penalty is appropriate. See Freeman v. State, 761 So.2d 1055, 1060 (Fla. 2000); Buckner v. State, 714 So.2d 384, 387 n. 3 (Fla.1998); Thompson v. State, 647 So.2d 824, 826 n. 2 (Fla.1994); Mann v. State, 603 So.2d 1141, 1142 (Fla.1992).
However, in Bogle v. State, 655 So.2d 1103, 1109 (Fla.1995), the Court rejected a defendant's claim that the trial judge failed to consider his artistic ability and capacity for employment as valid mitigation, noting that "[t]he fact that the trial judge did not specifically list Bogle's artistic talent and capacity for employment in mitigation is insufficient to overrule the trial judge's imposition of the death penalty given the minor weight that would be afforded to those factors." We conclude that, even assuming the trial court should have considered Evans' artistic ability as a mitigating circumstance, it is likely that the mitigator would have been assigned little weight. Cf. Freeman v. State, 563 So.2d 73, 74-77 (Fla.1990) (recognizing that artistic ability is "not [a] compelling" nonstatutory mitigator). Given the likelihood that the mitigator would have been assigned little weight, given the fact that the trial court engaged in a careful weighing of much more significant mitigation and given the aggravators found to exist by the trial court, we conclude that the any error in failing to weigh this mitigator is harmless beyond a reasonable doubt. Thus, we reject this claim.

5. Proportionality

In Evans' next claim, he asserts that the death penalty in this case is disproportionate given the fact that Connie received a life sentence for her involvement in the murder. Evans essentially argues that because Connie was as culpable, if not more culpable, than he was, the death penalty is inappropriate in this case. Moreover, Evans *109 asserts that, as compared to other cases, the death sentence is disproportionate in this case.
We have recognized that disparate treatment of a codefendant renders punishment disproportional if the codefendant is equally culpable. See Larzelere v. State, 676 So.2d 394, 406 (Fla.1996) (citing Downs v. State, 572 So.2d 895 (Fla.1990)). However, disparate treatment of a codefendant "is justified when the defendant is the more culpable participant in the crime." Larzelere, 676 So.2d at 407.
In this case, the trial court considered the relative culpability of Connie and Evans and made the following findings:
Connie Pfeiffer, the co-defendant, was tried after the defendant's penalty phase and the jury advisory sentence of death. During her penalty phase, the jury rendered an advisory sentence of life in prison without the possibility of parole for twenty-five years. On May 18, 1999, the court sentenced her to life in prison without the possibility of parole for twenty-five years. A co-defendant's life sentence is a factor which the trial court can consider in mitigation of a sentence of death for a defendant. Gordon v. State, 704 So.2d 107 (Fla.1997). The defendant argues that both he and the co-defendant are equally culpable for the death of Alan Pfeiffer and that the defendant should also receive a sentence of life in prison without the possibility of parole for twenty-five years. However, the evidence at trial established that the defendant was the one who fired the three fatal shots while waiting inside the trailer in the darkness for Alan Pfeiffer to arrive home from work. The defendant was more than the mere hired gun. He was the "mastermind" behind the planning and carrying out the murder plan as well as establishing the alibi for the participants. The defendant selected the weapon to be used for the murder and arranged to steal it from the Waddell home. The defendant disposed of any evidence connecting him to the murder scene. The evidence has established that the defendant was more culpable than the co-defendant. The court gives this mitigating circumstance moderate weight.
(Emphasis supplied.) We have carefully reviewed the record in this case and conclude that the trial court's finding that Evans was more culpable than Connie is supported by competent substantial evidence. Therefore, the fact that Connie received a life sentence as a result of a jury recommendation of life does not alone render the death penalty disproportionate.
Although we are mindful that Connie received a life sentence and certainly had the greatest motive in seeing the victim murdered, we cannot ignore the fact that Evans was both the shooter and planner of the actual details of the murder. We are further cognizant of Evans' youthful age of nineteen, but also note that Evans had above-average intelligence. Despite the trial court's finding that Evans had a history of mental illness, there was no connection made between Evans' past mental health history and the murder. Neither expert testified to any diagnosis of any mental illness or organic brain damage. In fact, the defense did not argue either statutory mental mitigatorsthat the capital felony was committed while Evans was under the influence of an extreme mental or emotional disturbance or that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Thus, we conclude that the imposition of the death penalty in this case is proportionate with other cases in which the triggerman of a contract killing was sentenced to death. See McDonald *110 v. State, 743 So.2d 501, 506-07 (Fla.1999); Gordon v. State, 704 So.2d 107, 117 (Fla. 1997); Bonifay v. State, 680 So.2d 413, 417-18 (Fla.1996); Kelley v. State, 486 So.2d 578, 586 (Fla.1986) (Overton, J., specially concurring).[10]

CONCLUSION
Accordingly, we affirm Evans' conviction and death sentence for first-degree murder.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, and QUINCE, JJ., concur.
ANSTEAD, J., concurs as to conviction and dissents as to sentence.
LEWIS, J., concurs in result only as to conviction and concurs as to sentence.
NOTES
[1] Connie never testified at Evans' trial because she invoked her Fifth Amendment rights. Connie was ultimately convicted of first-degree murder, the jury recommended a life sentence, and the trial court imposed a life sentence.
[2] Although Waddell did not remember whether she went back to the fair after dropping Evans off at the trailer, Thomas testified that they did go back to the fair after dropping Evans off at the trailer.
[3] Thomas testified that when she and Waddell originally went to the pickup spot for Evans, he was not there. Thomas stated that they proceeded to drive around and parked at a gravel parking lot. She testified that they did not see Evans, so they went back to the fair and waited another 30 to 45 minutes before leaving again to meet Evans at the pickup spot.
[4] Thomas stated that she and Evans disposed of the gun a few days after the murder in a canal so that fingerprints would be hard to find. By contrast, Waddell testified that the three of them disposed of the gun in a canal that night after shooting off the rest of the bullets. Moreover, according to Waddell, after they disposed of the gun, they went to a dirt road where Evans changed clothes and discarded the dark colored shirt and his shoes. He kept the dark colored pants.
[5] Waddell testified that this occurred the next day, and that they used pool chemicals. They also tried to burn the gun carrying case. According to Waddell, she, Evans, and Thomas were present when they tried to burn the pants. However, according to Thomas, she and Evans tried to burn Evans' pants after they got home from Denny's.
[6] In fact, the defense presented no witnesses during the guilt phase.
[7] The defense waived the following statutory mitigators: (1) lack of significant prior criminal history; (2) the defendant acted under the influence of another; (3) the defendant acted under any strong emotional duress; (4) impaired capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law; and (5) the victim's participation in or consent to the defendant's conduct.
[8] Evans claims that: (1) the trial court erred in denying Evans' motion to quash the indictment or dismiss the charge; (2) reversal is required under Anderson v. State, 574 So.2d 87 (Fla.1991), because the State's testimony at trial contradicted the case it presented to the grand jury; (3) the trial court erred in excluding the testimony concerning cannabanoids in the victim's blood; (4) the trial court erred in limiting the cross-examination of Detective Brumley to exclude hearsay; (5) the trial court erred in closing individual voir dire to Evans' family; (6) the trial court erred in denying Evans' motion for a statement of particulars and in allowing the State to argue in the alternative that Evans was the shooter or a principal; (7) the State's closing argument comments during the guilt phase were reversible error; (8) the State's voir dire examination of the jury regarding the testimony of coconspirators or codefendants constituted fundamental error; (9) Evans' death sentence is disproportionate; (10) Evans' death sentence is either disproportionate or unconstitutional because the State presented the jury with the alternative theories that Evans was either the shooter or a principal; (11) the State's closing argument comments during the penalty phase were fundamental error; (12) the trial court erred in giving no weight to valid mitigation; (13) the trial court erred in imposing the death penalty when the jury made no unanimous findings of fact as to death eligibility; (14) the trial court erred in finding that the murder was both cold, calculated, and premeditated and that the murder was committed for pecuniary gain (improper doubling).
[9] This case had resulted in a mistrial two times before the instant trial. The first trial ended in a mistrial when the jury could not agree upon a verdict. Evans' second trial ended in a mistrial due to prejudicial information regarding the first trial disseminated by a juror during voir dire questioning.
[10] In Evans' remaining points on appeal, he asserts that the trial court erred in imposing the death penalty because the jury made no unanimous findings of fact as to death eligibility. We have previously rejected that argument in Mills v. Moore, 786 So.2d 532, 536-37 (Fla.2001), cert. denied, 532 U.S. 1015, 121 S.Ct. 1752, 149 L.Ed.2d 673 (2001). Additionally, Evans claims that the imposition of the pecuniary gain and CCP aggravators constitutes impermissible doubling in the context of a murder-for-hire. However, we also have rejected this argument. See Larzelere v. State, 676 So.2d 394, 406 (Fla.1996) (holding that "the aggravating circumstance of committed for financial gain was based on the evidence that appellant killed her husband to collect life insurance; the factor of CCP was based on evidence that she meticulously staged her husband's murder to look as though it were committed during a robbery").