583 So.2d 1009 (1991)
Gregory CAPEHART, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 74231.
Supreme Court of Florida.
June 13, 1991.
Rehearing Denied September 3, 1991.
*1010 James Marion Moorman, Public Defender and Robert F. Moeller, Asst. Public Defender, Bartow, for appellant/cross-appellee.
Robert A. Butterworth, Atty. Gen., and Katherine V. Blanco, Asst. Atty. Gen., Tampa, for appellee/cross-appellant.
BARKETT, Justice.
Gregory Capehart appeals from his convictions for burglary and first-degree murder and the resulting sentences, including *1011 his sentence of death.[1] We affirm the convictions and sentence of death but vacate the sentence for burglary and remand with instructions.
According to the evidence, on the morning of February 4, 1988, Deputy Sheriff Jeffrey Clark was conducting a neighborhood check following the report of a break-in at Rebecca Henry's apartment in Dade City. Henry had been awakened around five in the morning by a black man, approximately five feet nine inches tall and one hundred sixty pounds, mashing a cushion down tightly on her face and demanding money. When she passed out, he left.
In connection with the investigation, Clark went next door to the residence of sixty-two-year-old Marlene Reeves and found the house ransacked and Reeves dead in her bed. Her face was covered with a pillow, and her underwear was pulled halfway down the legs; she was also wearing a nightgown and a brassiere that had been pushed up over her breasts.
A partial palm print was lifted from Reeves' window screen and was later matched to Capehart's right palm print. An autopsy revealed that Reeves had suffered injuries to her sexual organs, caused by a sexual assault that occurred just prior to her death. The cause of death was asphyxiation due to smothering. Under constant pressure, Reeves would have been unconscious after one or two minutes, and death occurred after five to ten minutes. Medical evidence indicated that Reeves died between 11:41 p.m. and 4:41 a.m.
Reeves' neighbor, Robert Caruthers, testified that he had seen a person wearing an orangish-yellow trench coat and a light brown fedora walk by his windows in the direction of Reeves' apartment between 4:40 and 6:00 a.m. Another witness, Diane Harrison, testified that around daybreak on the day of the murder, she had seen Capehart exiting the area where Reeves lived. He was wearing a long black trench coat and a hat.
An acquaintance of Capehart's, Carol McPhail, testified that she saw Capehart a few days after the murder and in response to asking why he did "that to that woman," Capehart replied, "`Well, they ain't going to catch me.'"
Capehart's longtime friend, Walter Harrison, testified that he was with Capehart on the day after Marlene Reeves' body was found and that they discussed the murder. Harrison had heard that the police were looking for a man with a black trench coat, and he had earlier loaned Capehart his black trench coat. Harrison asked Capehart if he had committed the murder, and Capehart "said he did it but he didn't mean to do it." Capehart had explained that he broke into the house through a window to get money "without hurting the lady, but she woke up." Capehart said he tried to knock her out with a pillow over her face, but he "accidentally killed her." Harrison then asked Capehart about it again, and this time Capehart denied committing the murder, claiming that he had been kidding Harrison.
The arresting officer, David McKinnon, testified that upon arrest Capehart told him that he was with some "dudes" who were "going to rob this old lady." Capehart claimed he was on the porch, and when the others did not come out for a while, he went inside and "saw the one dude sitting on top of the lady, strangling her." Capehart also said the police caught him because he must have left his fingerprints on the bedroom door.
Later, Capehart was transported to the Pasco County jail by another officer, Tom Muck. Muck testified that when he saw Capehart in the jail's yard several months later, Capehart called him over and told him: "`You know, I just wanted that girl's pussy.'"
In the penalty phase, the state introduced a judgment and sentence of Capehart's convictions for robbery, grand theft, and aggravated assault in 1986, and a photograph of Marlene Reeves as she was found. The defense presented the testimony of Capehart's mother, Shirley Capehart, and Dr. Joel Epstein, a clinical psychologist. Epstein testified that Capehart told *1012 him that his father was a severe alcoholic who beat him, that he had always had difficulties in school, and that he been in at least three fights where he had been rendered unconscious. Capehart also reported a long history of abusing alcohol and marijuana. Epstein found that Capehart was illiterate, although not retarded, and his "memory intellect" was borderline. He concluded that Capehart was not psychotic, but his hold on reality was marginal.
Dr. Sidney Merin, a clinical psychologist and neuropsychologist, was called by the state as its first rebuttal witness. Merin's opinion was that at the time of the murder, Capehart was not under the influence of a mental or emotional disturbance, nor did he have an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. He found that Capehart merely had an antisocial personality. The second rebuttal witness called by the state was Dr. Daniel Sprehe, a physician specializing in psychiatry. He likewise testified that at the time of the offense Capehart was not under the influence of a mental or emotional disturbance of any kind, and his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was not impaired in any way.
The jury recommended death by a vote of seven to five. The judge sentenced Capehart to fifteen years' imprisonment on the burglary charge and imposed the death penalty for the murder. The judge found as aggravating circumstances that (1) defendant was previously convicted of a felony involving the use or threat of violence to a person;[2] (2) defendant was engaged in a sexual battery or burglary when he committed this murder;[3] (3) defendant's commission of this murder was especially heinous, atrocious, or cruel;[4] and (4) defendant's commission of this murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[5] The judge found "[t]he only possible mitigating circumstance is a social explanation, i.e., Defendant is a poor black man exploding in anger over his frustration due to the ills of a discriminatory society heaped upon him."
Capehart initially contends that there was insufficient circumstantial evidence to establish that he was the person who killed Marlene Reeves. We find that the jury's verdict is supported by substantial, competent evidence of Capehart's guilt. Several witnesses placed him in the murder scene at the time of the murder. Capehart's palm print was wrapped around the window screen to Reeves' apartment in such a manner as to indicate that he had not merely touched the outside of the screen but had cupped his hand around the frame. Finally, in addition to the direct and incriminating statements to Carol McPhail, Tom Muck, and Officer McKinnon, Capehart confessed to Walter Harrison. We find the evidence sufficient for the jury to have reasonably rejected the defendant's hypothesis that a third person committed the offenses. See, e.g., State v. Law, 559 So.2d 187 (Fla. 1989).
Capehart next argues that the trial court erred in permitting Dr. Joan Wood, Chief Medical Examiner for the Sixth Judicial Circuit, to testify regarding the cause of death and the condition of the victim's body because she did not perform the autopsy, nor was the autopsy report admitted into evidence.[6] Capehart argues that under those circumstances, the state failed to lay a proper foundation for her testimony.
Section 90.704, Florida Statutes (1987), provides that an expert may rely on facts or data not in evidence in forming an opinion if those facts are of "a type reasonably relied upon by experts in the subject to support the opinion expressed." The record reveals that the state properly qualified Dr. Wood as an expert without objection, *1013 and that she formed her opinion based upon the autopsy report, the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case. We are satisfied that a proper predicate for her testimony was established and that the trial court did not abuse its discretion in overruling the defense objection. See, e.g., Sikes v. Seaboard Coast Line R.R. Co., 429 So.2d 1216 (Fla. 1st DCA), review denied, 440 So.2d 353 (Fla. 1983).
We find no merit to Capehart's argument that the trial court erred in permitting the state's fingerprint expert to testify that the Florida Department of Law Enforcement confirmed his conclusions because the record shows that defense counsel "opened the door" during cross-examination. We likewise find no merit in Capehart's claim that the trial court unduly restricted Capehart's cross-examination of Diane Harrison. In addition, Capehart's claim that the verdict form was improper was not preserved for appellate review by appropriate objection during trial.
Capehart's next claim is that the trial court erred in permitting Officer Muck to testify that there was no evidence to support Capehart's statements claiming that someone else killed Marlene Reeves and that Capehart was a liar. At trial, the defense objected when the state asked Muck the following:
Q. And are you familiar with the statements McKinnon says Mr. Capehart made to McKinnon at the time he was arrested in Orlando?
A. I like to think I am. Yes, sir.
Q. Based upon your investigation, your review of the investigation and your knowledge of this case, is there any reason to believe that Mr. Capehart told McKinnon the truth about there being someone else besides Capehart involved in killing, raping and robbing Marlene Reeves?
A. Are you saying what I know or what I have read? What I know, what I have read?
Q. Everything that you have read, everything you know about the investigation.
The judge overruled the objection and Muck then testified:
A. Absolutely none. As a matter of fact, he flat out lied to the officer from Orlando.
We agree with Capehart that the question was improper and the judge erred in overruling the defense objection. In asking whether Muck had "any reason to believe that Mr. Capehart told McKinnon the truth," the state invaded the province of the jury to assess the evidence. In addition, the question required Muck to testify based on an investigation file which included evidence that had already been ruled inadmissible, as well as hearsay statements and reports of third persons.
In responding negatively to the question, Muck added "as a matter of fact he flat out lied to the officer from Orlando." We note that the defense failed to object, move to strike, or request a curative instruction directed to the editorial response Muck gave regarding the veracity of the defendant. While we find that both the question and the editorial response were improper, in view of the entire record in this case we are persuaded that the error was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Capehart's final guilt-phase argument is that improper testimony concerning the personal characteristics of the victim was admitted into evidence. Edith Snow, a friend of Reeves, testified at length about the victim. She explained that Reeves was completely illiterate and could not tell time or make change. People took advantage of Reeves; she was once charged three dollars for a Coke. Reeves did not know how to use the telephone, and Snow had to put a lock on Reeves' telephone because people in the neighborhood began using it to make long distance calls. Snow also testified that Reeves had a definite speech impediment, and when she got very excited it was hard for her to communicate.
Capehart concedes that this testimony was presented without a defense objection, *1014 but argues that the personal characteristics of the victim became a focal point of the trial and so permeated the proceeding as to undermine fundamental fairness and reliability of the jury's verdict and recommendation of death. The law is clear that error predicated on the admission of such evidence must be preserved for review by appropriate objection at trial. Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). Accordingly, we do not address the merits of Capehart's claim. The defense counsel's failure to object to the admission of this evidence and the resulting prejudice, if any, is a question appropriately decided in a proceeding for post-conviction relief. See Fla.R.Crim.P. 3.850; see also, e.g., Kelley v. State, 486 So.2d 578 (Fla.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986).
The day after the jury returned a verdict of guilty on charges of burglary and first-degree murder, the trial court judge announced that he had received a letter from Capehart. Among other things, Capehart's letter complained about the all-white makeup of his jury, and said that Capehart's trial attorney "did not put up a very good defense." Capehart alleged that during closing argument his lawyer "spoke as if he was trying to prosecute" Capehart. Capehart concluded that he had been "misrepresented," and that this had a great impact on his case. Capehart therefore asked the court to relieve his lawyer of his duties and appoint another lawyer. After a brief inquiry, the court denied the request for new counsel, and proceeded with the penalty phase. Capehart claims that the court failed to conduct an adequate hearing concerning his request to replace his court-appointed attorney.
Without establishing adequate grounds, a criminal defendant does not have a constitutional right to obtain different court-appointed counsel. See Hardwick v. State, 521 So.2d 1071, 1074 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988). Capehart at no time asked to represent himself. His letter indicated only a dissatisfaction with his counsel and the guilty verdict, and it clearly is addressed to the replacement of counsel. The court addressed his allegations in open court and found them to be insufficient. While the better course would have been for the trial court to inform Capehart of the option of representing himself, see id., we do not find it erred in denying Capehart's request for new counsel.
Capehart alleges numerous other errors in the penalty phase, which he claims require reversal of his sentence of death. We find no merit to his argument that the court gave jury instructions that unconstitutionally diminished the jurors' responsibility and suggested that death is the penalty favored by the courts. See, e.g., Grossman v. State, 525 So.2d at 839-40. We also reject Capehart's claim that his constitutional rights were violated because the prosecutor furnished the state's mental health professionals with copies of Capehart's suppressed confession. The record indicates that at the time of trial the defense knew that the mental health experts had been provided copies of the suppressed confession, yet failed to object to the testimony or to request a voir dire of the witnesses to determine whether they had relied on those reports in formulating their opinions. Accordingly, this claim has not been properly preserved for appellate review.[7]
Capehart next argues that the trial judge erred in finding aggravating circumstances. We reject Capehart's claim that the trial judge erroneously found in aggravation that Capehart had been previously convicted of a capital felony or a felony involving the use or threat of violence to a person. Capehart's conviction for aggravated assault in 1986 supports this circumstance. We likewise find ample evidence in the record to support the circumstance of murder committed during the course of a sexual battery or burglary.
*1015 We also reject Capehart's claim that the court erroneously found the circumstance of heinous, atrocious, or cruel. Ample evidence in the record regarding both the method of killing and the sexual assault and resulting internal trauma to the victim supports this circumstance. The medical examiner testified that the injuries to Reeves' sexual organs would have caused her pain. She also explained that death by smothering is not instantaneous, and the victim would have remained conscious for up to two minutes. During that time the victim would have experienced a foreknowledge of death as well as anxiety and fear. Cf. Tompkins v. State, 502 So.2d 415, 421 (Fla. 1986) (strangulation of conscious victim), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). Accordingly, the trial court did not err in finding this circumstance.
We do not find, however, that the circumstance of cold, calculated, and premeditated murder is supported by the evidence in the record. The aggravating circumstance of cold, calculated, and premeditated murder is proper only where there is "a degree of premeditation exceeding that necessary to support a finding of premeditated first-degree murder." Hardwick v. State, 461 So.2d 79, 81 (Fla. 1984) (citing Smith v. State, 424 So.2d 726 (Fla. 1982), cert. denied, 462 U.S. 1145, 103 S.Ct. 3129, 77 L.Ed.2d 1379 (1983)), cert. denied, 471 U.S. 1120, 105 S.Ct. 2369, 86 L.Ed.2d 267 (1985). The required level of premeditation is appropriately found where the evidence indicates that the "defendant's actions were accomplished in a calculated manner, i.e., by a careful plan or prearranged design to kill." Holton v. State, 573 So.2d 284, 292 (Fla. 1990). We do not find any evidence in the record demonstrating this level of premeditation. The state argues that where smothering takes several minutes to kill the victim, the act per se qualifies as cold, calculated, and premeditated murder. However, "the fact that it takes the victim a matter of minutes to die once the process begins" does not alone support this finding. Hardwick, 461 So.2d at 81 (circumstance not proven where victim died from strangulation); see also, e.g., Holton, 573 So.2d at 292. Accordingly, we cannot say this factor was proven beyond a reasonable doubt.
Capehart also suggests that the judge ignored evidence of nonstatutory mitigating circumstances. We have reviewed both the record and the trial court's written findings. We conclude that the judge's order reflects that he gave proper consideration to the testimony presented in mitigation and did not abuse his discretion in determining the amount of weight due the nonstatutory mitigating evidence.
Having determined one aggravating circumstance was erroneously considered by the trial judge, we must determine whether this error was harmless. The record before us reflects three valid aggravating circumstances and one nonstatutory mitigating circumstance. Having carefully scrutinized the record in this case, we are persuaded beyond a reasonable doubt that even without the aggravating circumstance of cold, calculated, and premeditated murder, the trial court still would have found that the aggravating circumstances outweighed the mitigating evidence. Thus, the error was harmless beyond a reasonable doubt. See, e.g., Holton, 573 So.2d at 293. We therefore affirm the sentence of death.
Finally, Capehart argues that the trial court erred in sentencing him for the noncapital crime of burglary without regard to a sentencing guidelines scoresheet. We agree. As we recently noted, Florida Rule of Criminal Procedure 3.701(d)(1)[8] "mandates that a sentence be imposed based on a sentencing guidelines scoresheet that has been reviewed by the trial judge." Holton v. State, 573 So.2d at 290-91. *1016 We therefore vacate Capehart's sentence for burglary and remand for resentencing after a guidelines scoresheet has been prepared and reviewed by the trial court.
In sum, we affirm Capehart's convictions and sentence of death, but vacate the sentence for burglary and remand for imposition of a sentence on the burglary conviction pursuant to a guidelines scoresheet.[9]
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] See § 921.141(5)(b), Fla. Stat. (1987).
[3] Id. § 921.141(5)(d).
[4] Id. § 921.141(5)(h).
[5] Id. § 921.141(5)(i).
[6] The medical examiner who performed the autopsy and prepared the autopsy report died prior to Capehart's trial.
[7] While we decline to rule on the merits in this case, we do not suggest that the practice of supplying mental health experts copies of illegal evidence is permissible. See Walls v. State, 580 So.2d 131 (Fla. 1991).
[8] Florida Rule of Criminal Procedure 3.701(d)(1) provides:

One guideline scoresheet shall be utilized for each defendant covering all offenses pending before the court for sentencing. The state attorney's office will prepare the scoresheets and present them to defense counsel for review as to accuracy in all cases unless the judge directs otherwise. The sentencing judge shall approve all scoresheets.
[9] Because we affirm the conviction, we need not address the state's cross-appeal issue regarding the suppression of one of Capehart's statements.