832 So.2d 850 (2002)
Robert CARRATELLI, Appellant,
v.
STATE of Florida, Appellee.
No. 4D00-2714.
District Court of Appeal of Florida, Fourth District.
November 20, 2002.
Rehearing Denied January 15, 2003.
*851 Roy Black and Christine M. Ng of Black, Srebnick & Kornspan, P.A., Miami, for appellant.
Richard E. Doran, Attorney General, Tallahassee, and David M. Schultz, Assistant Attorney General, West Palm Beach, for appellee.
PER CURIAM.
Robert Carratelli was tried by jury, convicted of six counts of vehicular homicide, *852 and sentenced to fifteen years in prison. The charges arose from an accident that occurred on June 4, 1999, when Carratelli drove his Mercedes Benz at a high rate of speed through a red light and into a 1994 Mercury Grand Marquis LS. All six passengers in the Grand Marquis died at the crash scene.
On appeal, we address two of Carratelli's claims and hold that: (1) Carratelli failed to preserve error arising from the denial of his juror challenges for causes and (2) there was no error in admitting in evidence of expert accident reconstruction testimony and a diagram which formed a part of the basis for that testimony.

Jury selection
The jury selection process was lengthy and difficult due to extensive pretrial publicity. During the voir dire, defense counsel moved to exclude a number of potential jurors for cause.
We find that the trial court abused its discretion in denying the defense's attempted strikes for cause as to jurors Nesbitt, Johnson, and Lott.
Nesbitt had worked for fifteen years in law enforcement and for five years as a fireman. When initially asked by the trial judge whether he could be a fair and impartial juror, Nesbitt responded that he was not sure. He vacillated between indicating that he could be fair and that he might not. Nesbitt admitted that he had seen television and news reports concerning the accident and that at the time of the accident, he had read many stories about it every day in the newspaper.
When asked if he could set aside what he had heard or read, Nesbitt responded, "I believe, I could." He stated that he had talked about this case with his law enforcement friends; they specifically discussed the speed of appellant's vehicle and appellant's diabetic condition. In addition, the following colloquy took place regarding any preconceived opinions Nesbitt may have had:
Defense: In terms of your police officer relationships and the discussion and the publicity, is it a fair statement to say that the defense is not starting on an equal playing field?
Nesbitt: As far as me?
Defense: Yeah.
Nesbitt: I would hope to say that you would be. But it's a little hard for me to answer that question, because I don't know if I really formed an opinion or not. I try not to. But if I had
Defense: If you have, what is it?
State: I object to him giving his opinion.
Court: Overruled.
Nesbitt: There could be a matter of guilt there, but that's my opinion, but I can't say for sure that I can't be convinced with evidence.
Defense: In other words, you are saying I might be able to talk you out of that?
Nesbitt: With evidence, I've got to see the evidence. I have to see the evidence and if the evidence is there, beyond a reasonable doubt, I believe I can make the right decision butreject my opinion, whatever it may be, but I have to go strictly by the evidence.
Defense: You are saying the evidence could convince you to reject the opinion that you have?
Nesbitt: Yeah, yeah. If there is a guilty beyond a reasonable doubt, okay, I would have to go one way.
Defense: What way?
Nesbitt: Guilty, but if it is not there, I can't, in all honesty, vote guilty for somebody that it wasn't proven against.
*853 Defense: It happens. The last question for you: Is it a concern in your mind, though, that it might take more of a defense or more evidence to help convince you to find Mr. Carratelli not guilty than it might otherwise take if you weren't who you are, having discussed this case and having read what you read?
Nesbitt: I don't think it would take more. Whatever evidence is presented in the case, I am going to have to go with that evidence and I don't think I would be coming back and say, I need more.
Defense: Now, would you suggest might it be more difficult for Mr. Carratelli to be acquitted with you as a juror than with a juror that didn't have the preconceived opinion as it were, as you described it?
Nesbitt: The way you put that, in all fairness to him probably it would, but that'sI don't want to sit here and say, you know, no, but.
Subsequently, the State asked Nesbitt if he could set aside the conversations he had had with his friends, view the evidence on the facts, apply the law to the facts, and not prejudge the defendant. Nesbitt responded that he could.
Juror Lott initially expressed doubts as to whether she could keep her feelings out of her decision. She mentioned that a friend had recently lost a child in an ATV accident.
Lott: I know my emotions would come into play because I would think, you know, if I am to think about that child, this doesn't even involve kids. I know my emotions will come into it.
Defense: And will itwill that then serve to the detriment of Bob Carratelli?
Lott: It could possibly, and I wouldn't want it to be, so I would honestly say that in fairness to him, I don't think youI would be good for him, you know, emotional wise. I don't think I'm there yet.
Defense: Because of the recency of that tragedy, do I hear you saying that you feel that you do not believe that you could be as fair and impartial as the law would want you to be on this particular case?
Lott: Yes, and as he deserves.
Defense: So you would rather not sit because of that?
Lott: I would, because I would want someone sitting here in a reverse role to be totally, you know, I would want them to be totally, out of a hundred percent of themselves, and I am not. And just don't think I would be fair to him.
The state asked Lott if she would follow the law and listen to the facts, and she responded, "uh-hum." The trial judge also asked Lott if she could do the job and be emotional and logical at the same time, and she stated, "I'll try, yeah, yes, I would think I would."
Juror Johnson initially told the trial judge that she would not have any problems being fair and impartial, but when questioned by the defense indicated otherwise.
Defense: Are you concerned that because of the magnitude of this accident that you can't really concentrate and be fair?
Johnson: I don't think I could be fair. I just
Defense: It's okay too, I just need to know.
Johnson: I don't have the words.
Defense: Are you overwhelmed by the tragedy?
Johnson: Yeah, I feel sorry for the six people that lost their lives.
*854 Defense: Do you feel because of that, that you are just not going to be able to be fair to Mr. Carratelli in case [sic]?
Johnson: Yeah.
Defense: Even though you['d] like to be?
Johnson: Yes.
Defense: You just know, no matter what the judge tells you, you are not going to be able to be fair?
Johnson: No.
Defense: Do you agree with that statement?
Johnson: Yes.
Defense: And you would rather not be seated because you can't be fair
Johnson: Right.
Defense:to Mr. Carratelli?
Johnson: Yes.
When questioned by the State, Johnson indicated that after listening to all of the evidence, she "probably could" be fair to both sides.
An appellate court reviews a trial judge's decision on a for-cause challenge for an abuse of discretion. See Singleton v. State, 783 So.2d 970, 973 (Fla.2001). "`The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court.'" Street v. State, 592 So.2d 369, 371 (Fla. 4th DCA) (on clarification) (quoting Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984)). "A juror should be excused for cause if there is any reasonable doubt about the juror's ability to render an impartial verdict." Singleton, 783 So.2d at 973. "Because impartiality of the finders of fact is an absolute prerequisite to our system of justice, we have adhered to the proposition that close cases involving challenges to the impartiality of potential jurors should be resolved in favor of excusing the juror rather than leaving doubt as to impartiality." Williams v. State, 638 So.2d 976, 978 (Fla. 4th DCA 1994).
Consistent with the foregoing principles, the courts have held that the mere fact that a juror eventually acquiesces and asserts that he or she can be fair does not necessarily resolve doubts initially raised as to that juror's ability to sit as a fair and impartial fact-finder:
The rehabilitation of prospective jurors is a tricky business that often leads to reversal. Although Florida law allows for the rehabilitation of prospective jurors whose responses during voir dire examination raise questions concerning their impartiality, "[a] juror is not impartial when one side must overcome a preconceived opinion in order to prevail." Price v. State, 538 So.2d 486, 489 (Fla. 3d DCA 1989). As the Florida Supreme Court has observed:
It is difficult, if not impossible, to understand the reasoning which leads to the conclusion that a person stands free of bias or prejudice who having voluntarily and emphatically asserted its existence in his mind, in the next moment under skillful questioning declares his freedom from its influence. By what sort of principle is it to be determined that the last statement of the man is better and more worthy of belief than the former?
Johnson v. Reynolds, 97 Fla. 591, 599, 121 So. 793, 796 (1929).
Martinez v. State, 795 So.2d 279, 283 (Fla. 3d DCA 2001).
Here, the record demonstrates reasonable doubts concerning Nesbitt's, Johnson's, and Lott's abilities to be fair and impartial. Those doubts were not dispelled during subsequent questioning. Each of these jurors expressed significant reservations about their suitability to sit as jurors in this case. While a prospective *855 juror's own perception of his or her unfitness to sit as a fair and impartial juror in a particular case does not end the inquiry, such an assessment cannot easily be disregarded. Because Nesbitt's, Johnson's, and Lott's responses created a reasonable doubt as to their ability to sit as fair and impartial jurors, the trial court abused its discretion in denying appellant's challenges for cause to this trio. See Williams, 638 So.2d at 978 (holding that juror's response to the judge that "I'll be impartial because that's my character" was not sufficient to erase the doubt created by his other comments and, thus, the trial court abused its discretion in refusing to strike the juror for cause); Brown v. State, 728 So.2d 758, 759 (Fla. 3d DCA 1999) (holding that juror's response to judge's question regarding whether juror could set aside personal feelings of crime: "Yeah, I think so," was equivocal).

The defense failed to preserve the issue regarding cause challenges
To say that the trial court erred in failing to grant cause challenges does not end the inquiry.
"[T]o preserve for appellate review a claim that the trial court improperly denied a cause challenge to a juror, a defendant must exhaust his peremptory challenges, request an additional peremptory challenge from the court, and demonstrate that an objectionable juror was seated." Jenkins v. State, 824 So.2d 977, 981 (Fla. 4th DCA 2002).
The trial judge understood the state of the law. During voir dire, he allowed each side two additional peremptory challenges. The next day the judge denied a defense request for additional challenges, observing that the defendant still had "a strike left." Later that afternoon, the judge denied a defense request for additional challenges immediately after a discussion that confirmed that the defendant still had one challenge remaining.
At that point, the request for additional challenges was not ripe, because the defendant had not yet exhausted his peremptory challenges. The existence of additional peremptory challenges is crucial because of the reason why appellate courts reverse when a trial judge has erroneously refused to grant a cause challenge. The erroneous refusal to grant a cause challenge abridges a defendant's right to peremptory challenges
by reducing the number of those challenges available [to] him. Florida and most other jurisdictions adhere to the general rule that it is reversible error for a court to force a party to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied.
Id. (quoting Hill v. State, 477 So.2d 553, 556 (Fla.1985)). This language from Hill indicates that a request for an additional challenge should follow a party's exhaustion of peremptory challenges. There is no legal reason for allowing additional challenges if a party has peremptory challenges remaining, because no prejudice has yet occurred.
The defendant used his last peremptory challenge to strike prospective juror Berry. The state accepted the jury. The court turned to defense counsel: "Those six jurors unless additional challenges from the defense, [defense counsel]." Defense counsel responded: "Ifif there are others, I would challenge including Mr. Inman, and others, if you granted me more peremptories."
The trial court did not respond to defense counsel's statement. There is no indication that the judge even heard it. Throughout the trial, the court was careful to rule on the record on other objections and motions. The judge's very next question *856 concerned the alternate juror. After the state struck an alternate, the defense accepted the next alternate seated "without waiving the challenge to the jury itself."
Defense counsel's statement quoted above was neither a motion nor a request for additional peremptory challenges. Even if counsel's statement was an adequate communication of the desire for an additional strike, the defense did not preserve the issue for appellate review because it failed to pursue the motion and obtain a ruling on it.
This point is controlled by Richardson v. State, 437 So.2d 1091, 1094 (Fla.1983). In that case, the defendant moved to strike certain testimony at a sidebar conference. The judge did not rule and the defendant "did not pursue his motion to strike" to obtain a ruling from the court. Id. Under those circumstances, the supreme court held that the defendant had not preserved the issue for appeal. Id. Here, defense counsel's failure to obtain a ruling on his "request" for additional challenges similarly failed to preserve the issue regarding cause challenges. See Armstrong v. State, 642 So.2d 730, 740 (Fla.1994) (citing Richardson with approval).
A plethora of Florida cases support the notion that a party must obtain a ruling from the trial court in order to preserve an issue for appellate review. See Rose v. State, 787 So.2d 786, 797 (Fla.2001), cert. denied, 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 252 (2002) (noting that as a general rule, the failure of a party to get a timely ruling by a trial court constitutes a waiver of the matter for appellate purposes; citing with approval to Richardson); Bush v. State, 809 So.2d 107, 117 (Fla. 4th DCA 2002) (holding that the defendant failed to preserve for appellate review one prosecutorial closing argument comment because she did not object at all and failed to preserve a second prosecutorial closing argument comment because she "failed to secure a ruling on her objection... and failed to move for a mistrial") (emphasis added); Filan v. State, 768 So.2d 1100, 1101 (Fla. 4th DCA 2000) (where this court wrote that "[a]n issue or objection is `preserved' within the meaning of [§ 924.051(3) ] if it was timely raised and ruled on by the trial judge and if the objection was `sufficiently precise that it fairly apprised the trial court of the relief sought and the grounds therefor.'" (Emphasis added) (quoting § 924.051(1)(b), Fla. Stat. (1999))); LeRetilley v. Harris, 354 So.2d 1213, 1214 (Fla. 4th DCA 1978) (observing that "failure to secure a ruling on an objection waives it, unless the court deliberately and patently refuses to so rule"); Willingham v. State, 781 So.2d 512, 513 (Fla. 5th DCA 2001) (defendant who moved for a directed verdict both at the end of state's case and at the end of his own case, arguing that the evidence was insufficient to support conviction, failed to preserve this issue for appeal because the court merely reserved a ruling on these motions but never made a ruling); Newton v. S. Fla. Baptist Hosp., 614 So.2d 1195, 1196 (Fla. 2d DCA 1993) (failure to obtain clear ruling from trial court waives for appellate review issue of whether comment in closing argument was improper); Schreidell v. Shoter, 500 So.2d 228, 233 (Fla. 3d DCA 1986) (finding waiver where party objected to the opponent's comment in closing argument and moved for a mistrial, but "the trial judge made no response to either request") (emphasis added); Coffman v. Kelly, 256 So.2d 79, 80 (Fla. 1st DCA 1972) (holding that a party's failure to secure a ruling on a motion was fatal: "The trial court can hardly be held in error for a ruling it did not make.").
A superficial reading of one case from this court appears to depart from this weight of authority, but that case is not truly inconsistent and is distinguishable from the case at bar. In the personal *857 injury case of Colvin v. Williams, 564 So.2d 1249, 1250 (Fla. 4th DCA 1990), this court held that the appellant/plaintiff preserved for appeal an objection to evidence concerning the plaintiff's prior litigation experience, even though the trial court did not make a specific ruling on the issue. This court wrote:
It is the trial court's responsibility to make a dispositive ruling on all objections or motions that are properly brought before it. We can hardly fault a litigant, once a proper objection has been lodged with the court, if the court's response is something other than a clear "sustained" or "overruled." In this case, it appears that the trial court responded to appellant's objection by simply saying "fine."

Id. (emphasis added).
Colvin is distinguishable for two reasons. First, the plaintiff in Colvin made a "proper objection." Id. The defendant here did not actually move for additional peremptory challenges. Second, the trial judge in Colvin responded to the plaintiff's objection by saying "fine"; the judge's failure to take further action allowed the disputed matters into evidence, so his conduct was tantamount to a ruling. The trial court in this case made no response to Carratelli's "motion or request" for additional challenges. A ruling on that issue cannot therefore be inferred from the record.
The second district in Newton disagreed with the language of Colvin suggesting that a party does not need to seek a specific ruling to preserve an issue for appellate review. 614 So.2d at 1196. The second district held that a party must obtain a "clear ruling" on an objection in order to preserve it. Id.
A better reading of Colvin is not that it receded from the general and well-settled rule that a party must secure a ruling on an objection to preserve it for appeal. Rather, Colvin was a case where the judge's verbal response to the objection and his subsequent conduct left no doubt as to his ruling. The law in this district is still that the burden is on a party to secure a ruling where the trial court has made no response at all to an objection. See also U.S. v. Alejandro, 118 F.3d 1518, 1520 (11th Cir.1997) (holding that it is "incumbent" for a party to seek clarification of an ambiguous ruling for preservation purposes).
Requiring the record to demonstrate preservation of an objection to an erroneous denial of a cause challenge is justified by the severity of the sanction for such a mistake. In such cases, reversal is automatic, even where the trial is otherwise perfect, even if the questioned juror actually served with the wisdom of Solomon.

The evidence at trial
The evidence was undisputed that Carratelli ran a red light at a high rate of speed and collided with a Mercury, which was preparing to make a left turn onto Yamato Road. Carratelli did not dispute that he ran the light but attempted to establish that he had become disoriented and may have passed out behind the wheel just prior to the collision due to complications from his diabetic condition.
Carratelli relied on the defense that as a Type I, insulin-dependent diabetic, he suffered from a medical condition called syncope, which caused him to lose consciousness and run the red light. According to the expert medical testimony presented by the defense, syncope is defined as the transient loss of consciousness (fainting). Syncope is common in people with diabetes. The person having a syncope episode may lose the ability to reason, react or control his actions, and if the episode continues, may eventually pass out. Carratelli was not diagnosed as having syncope until after the accident and now takes medication for it.
*858 The state did not attempt to refute appellant's defense with medical testimony of its own. Instead, the state advanced the theory that Carratelli took action at the last minute to avoid the accident; therefore, he could not have been unconscious or seriously disoriented at the time. The very existence of a skid mark, a disputed fact at trial, was contrary to Carratelli's theory of the case. This factual dispute boiled down to the credibility of the evidence, a matter within the exclusive province of the jury.
Several witnesses either observed the accident or saw Carratelli's vehicle shortly before the collision. Eyewitness accounts varied as to whether Carratelli applied the brakes or took any other evasive action as he went through the light. Florida Highway Patrol (FHP) Corporal Timothy Watts was the assigned investigator and arrived on the scene shortly after the crash to take witness statements and measurements.
Two trained witnesses responded to the accident scene and testified to the existence of skid marks left by the defendant's Mercedes just before impact. Both witnesses testified at trial.
Lieutenant Roy Rogers was a twenty-nine year veteran with the FHP who arrived at the accident scene as a supervisor. He had investigated about 3,000 traffic accidents and 100 traffic homicides. He reconstructed how crashes had occurred and testified in court as an expert. Rogers opined that the Mercedes' "brakes were applied" prior to impact. The evidence on the roadway of braking was "a mark in the right-hand." Rogers characterized the mark as "a tire mark left by the Mercedes braking and steering to the left." The mark was a solid mark; although very light, it was not difficult to see.
With the FHP for over twenty-two years, Sergeant Richard Davis was in charge of the traffic homicide division in Palm Beach County. He was a trained traffic homicide investigator who had investigated over 100 homicides himself. He had testified in court concerning traffic accident reconstruction. Davis responded to the accident scene on the night of the collision.
Davis observed skid marks that "indicated braking." The marks were "east of the established zero point, east of the actual collision on the westbound lane." The marks were "very light"; Davis said that "you had to almost get down into the road to look at them kind of level to see them because you couldn't hardly see them, which was indicative of skid marks from a vehicle that were braking, and they lined up straight with the collision area." Davis thought there were two marks that led to the point of collision; one that was very distinct, which one could see by "just getting down and looking," and the other which was "very, very light" off to the south side of it. Davis said that this type of skid mark was consistent with an antilock brake system. He reviewed Corporal Perry Allen's finished accident report and found it to be "consistent with the physical evidence" that he observed at the scene on the night of the accident.
On a videotape taken at the scene on the night of the collision, Davis showed the jury the "very light skid" mark that he described.[1]
*859 The state's final witness in its case-in-chief was Corporal Allen. Allen had been a traffic homicide investigator with the FHP for fourteen years. He had investigated several thousand accidents and 132 traffic fatalities. He attended over 800 hours of schooling concerning the investigation of motor vehicle crashes. He testified in court four times as an accident reconstructionist. Allen was assigned the case in August, 1999, after the death of Corporal Watts, the initial investigator.
In reconstructing how a crash occurred and which vehicle caused a crash, Allen generally relied on mathematical formulas, physical evidence, and witness statements. In this case he reviewed photographs of the scene taken by Watts and visited the crash scene seven or eight times to "verify evidence that [he] received," such as measurements. He reviewed the videotape which Sergeant Davis narrated for the jury. He interviewed two witnesses and reviewed the witness interviews conducted by Corporal Watts. Allen relied on measurements taken by Watts and other troopers and verified those measurements during his visits to the crash scene.
Allen completed a homicide report, a reconstruction diagram, and a final rest diagram of the accident. The state attempted to introduce Allen's reconstruction diagram into evidence as State Exhibit 30. The defendant objected; his primary concern was Watts' measurements of the skid mark. The judge sustained the objection and required the state to proffer Allen's testimony on the skid mark measurements.
During the proffer, Allen testified that he went to the accident scene with Sergeant Davis to measure the skid marks. He measured from the area of collision "to where the skid marks would have been." He determined where to measure from Sergeant Davis's indication of the location of the skid marks. He physically measured "from the area of impact to the stop bar where Sergeant Davis has testified he saw the mark." These measurements were consistent with the skid mark measurements made by the deceased Corporal Watts. On cross-examination, Allen conceded that the precise length of the skid mark depicted on Exhibit 27 was based on Watts's earlier measurement. The court asked Allen several questions:
The Court: ... Corporal, is there anything indicated on exhibit 30 [the reconstruction diagram] that you did not independently verify?
* * *
Allen: Both of them [Exhibits 27 and 30] have the skid mark on them and I did measure and verify the measurement that I received when I went there and the actual skid mark wasn't there.
The Court: But you went with Trooper Davis?
Allen: Yes.
The Court: Who indicated from where to where he recalled it being?
Allen: Yes, sir.
The Court: And you remeasured that?
Allen: Yes.
The Court: And on 27 [the final rest reconstruction diagram], what is the difference on 27?
Allen: They both have the skid marks.
The Court: And the same answer would be true then as far as everything else you independently verified?
Allen: Yes, sir.
At the end of the proffer, the judge decided to admit the final rest and reconstruction diagrams into evidence.
When direct examination resumed, Allen utilized the reconstruction diagram to describe *860 the collision and what happened to the vehicles after it. Using measurements derived from the crush damages to the victims' car, the angles of impact and departure, post impact speeds, and the weights of the cars, Allen testified that the defendant's Mercedes was traveling at sixty-six miles per hour at impact.[2]
The prosecutor asked Allen his opinion concerning the speed of the Mercedes when it entered the intersection prior to impact. The defendant objected. During a long bench conference, the court overruled the objection, observing that his previous ruling had precluded the prosecutor from getting into "any length of the skid mark" based on the deceased Corporal Watts's measurements. The following testimony was then elicited:
State: Corporal Allen, in your opinion did the Mercedes brake prior to impact?
Defense Attorney: Objection for the same reasons.
Court: Overruled.
State: You may answer.
Allen: Yes.
State: Did you factor in that braking period?
Allen: Yes.
State: And when you factored that in, what speed did you come up with at the time the brakes were applied?
Defense attorney: Objection, for all the reasons previously stated. Do I have to restate them?
Court: No, sir. Overruled.
Allen: Minimum speed of 76 miles per hour when it entered the intersection.
On the state's direct examination, it is clear that Allen abided by the court's ruling and did not disclose Watts' measurements of the skid mark. There are no measurements on the final rest and reconstruction diagrams admitted into evidence. The state did not introduce the sketch removed from Corporal Watts' home.
On cross-examination, the defense explored in detail the basis for Allen's use of the disputed skid mark. Allen said that although the skid mark appeared for two seconds on the video, he would have taken photographs to document it had he been at the scene on the day of the collision. Allen conceded that he could not "recreate" the skid mark with only the information he obtained from Sergeant Davis. He said he also relied on the Watts diagram, which the defense then had marked as Defense Exhibit 5. Allen found the Watts diagram in a file inside Watts' house. The sketch contained numbers and measurements. In response to defense questions, Allen testified that the diagram supported his opinion that there was a single skid mark sixty-three feet long, which started at the stop bar and stopped ten feet before the collision site.
On redirect examination, Allen asserted that his own measurements taken at the scene "were consistent" with those recorded by Corporal Watts. The state desired to question Allen about the contested sketch, Defense Exhibit 5. The defense agreed to admit that exhibit into evidence as State's Exhibit 42. Defense counsel noted that this stipulation was in response to the court's earlier, disputed ruling on Allen's testimony, which forced him to "show what Watts did and didn't do." The state then asked Allen to explain Watts' sketch. Allen demonstrated how he obtained the skid mark length from the measurements and marks on the sketch. He explained that to formulate his opinion he often relies on what other troopers tell him.
*861 Corporal Allen's testimony and reconstruction sketch were properly admitted into evidence pursuant to section 90.704, Florida Statutes (2001)
Florida courts have admitted expert opinions of accident reconstruction experts to evaluate factors in traffic accidents. See Bryant v. Buerman, 739 So.2d 710, 712 (Fla. 4th DCA 1999) (concerning testimony about speed of vehicle at time of collision); Andrews v. Tew, 512 So.2d 276, 279-80 (Fla. 2d DCA 1987); Sikes v. Seaboard Coast Line R.R. Co., 429 So.2d 1216, 1222 (Fla. 1st DCA 1983). As Judge Klein has observed, "it is well settled that an expert in accident reconstruction can render an opinion about the speed of a vehicle and force of impact. Whether that issue can be the subject of expert testimony is not controversial." Bryant, 739 So.2d at 713 (Klein, J., concurring).
The trial judge's handling of Allen's testimony is a textbook example of how section 90.704, Florida Statutes (2001) is intended to operate. That section allows an expert to give an opinion based on facts or data that are not admissible in evidence, if "the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed." Id. Here, the field measurements of Corporal Watts are the type of information reasonably relied upon by an accident reconstructionist to formulate an opinion of how an accident occurred. The trial court did not err in admitting Allen's opinion.
To avoid the situation where an expert was a conduit for inadmissible evidence, the judge required the state to have Allen give his opinion without disclosing the disputed facts from Watts' sketch. Section 90.705(1), Florida Statutes (2001) allows an expert to "testify in terms of opinion or inferences ... without prior disclosure of the underlying facts or data." Where on direct examination an expert does not specifically describe the data upon which an opinion is based, "the expert may be asked on cross-examination about the underlying facts and data. During cross-examination, the expert may be required to disclose all of the evidence relied upon regardless of whether it is otherwise admissible." CHARLES W. EHRHARDT, FLORIDA EVIDENCE § 704.1 (2002 ed.). In this case, the disputed sketch was not disclosed to the jury until cross-examination. The defendant was permitted to cross-examine Allen to attempt to demonstrate that his opinions were based on shaky foundations.
This case is similar to Sikes. There, an "accident reconstructionologist" prepared a model for the jury demonstrating his opinion of "how he believed the accident may have occurred." 429 So.2d at 1222. The expert based his opinion on the depositions of the deceased victim's son, "train personnel, statements of apparently disinterested witnesses, surveys of the accident site, two visits to the site, pictures of the site and a homicide report, among others." Id. The appellant in Sikes objected because the opinion was "based on information either not in evidence or that was inadmissible." Id. Citing to section 90.704, the first district rejected this argument, because the sources of information identified above on which the expert based his opinion were "the types of information [upon which] such an expert would normally rely." Id.
Carratelli's reliance on Riggins v. Mariner Boat Works, Inc., 545 So.2d 430 (Fla. 2d DCA 1989) is misplaced. The essence of Riggins is that section 90.704 "does not `typically permit an expert to render an opinion exclusively upon inadmissible facts or data.'" Maklakiewicz v. Berton, 652 So.2d 1208, 1209 (Fla. 3d DCA 1995) (emphasis added) (quoting Riggins, 545 So.2d at 432); see Bender v. State, 472 So.2d 1370, 1371 (Fla. 3d DCA 1985) (observing *862 that "the hearsay rule poses no obstacle to expert testimony premised, in part ... upon tests, records, data, or opinions of another, where such information is of a type reasonably relied upon by experts in the field") (citations omitted). Giving an example of an expert opinion not based exclusively upon inadmissible facts, the Riggins court observed that "[w]hen a doctor renders an opinion based upon an inadmissible laboratory report, that opinion is usually buttressed by additional facts which are in evidence or by an examination of a patient whom the jury has also observed." 545 So.2d at 432.
An example of improper bolstering under section 90.704 occurs when an accident reconstruction expert testifies to point of impact based only on the hearsay statements of bystanders who do not testify at trial. See Sikes, 429 So.2d at 1222-23. This situation occurred in Maklakiewicz, a case involving a pedestrian-car collision. 652 So.2d at 1209. To reconstruct the accident, the expert relied exclusively on the hearsay statements of the only eyewitness, "a homeless person who was never found for deposition or trial" and the testimony of a medical examiner who was not deposed and did not testify. Id. Other than the witnesses' testimony, there was no physical evidence that would explain how the accident occurred. Following Riggins, the third district held that the expert's opinion was inadmissible because it was "exclusively" based upon inadmissible facts or data. Id.
This case differs from Riggins and Maklakiewicz in an important respect. Allen's opinion was not based exclusively on inadmissible data. The crucial fact in this case was the existence of a skid mark attributable to the defendant, not its length. Two experienced witnessesLieutenant Rogers and Sergeant Davistestified about observing the skid mark on the night of the collision. Davis pointed out the skid mark on the videotape played for the jury. The basis of the trial court's ruling admitting Allen's testimony, which was apparent during the excerpt from the proffer quoted above, was that Allen relied on information given by witnesses who testified at trial to formulate his opinion about the skid mark.
This case is much closer to Capehart v. State, 583 So.2d 1009 (Fla.1991), a case decided after Riggins. Capehart was a homicide case where the medical examiner who performed the autopsy on the victim died before the defendant's trial. Id. at 1012 n. 6. The deceased examiner's autopsy report was not admitted into evidence. The defendant objected to another medical examiner testifying at trial "regarding the cause of death and the condition of the victim's body." Id. at 1012. Although there was no objection to the new medical examiner's qualifications as an expert, the defendant argued that there was not a "proper foundation" for her testimony. Id.
The supreme court in Capehart held that under section 90.704, there was a proper predicate for the medical examiner's testimony, even though she relied on facts or data not in evidence, because such information was of "`a type reasonably relied upon by experts in the subject to support the opinion expressed.'" Id. (quoting § 90.704, Fla. Stat. (1987)). The court observed that the expert "formed her opinion based upon the autopsy report, the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case." Id. at 1013.
Similar to Capehart, this was a case where the expert who did the hands-on work died before trial. Like the autopsy report in Capehart, the Watts sketch of the scene was not admissible in evidence on the state's direct case, but it was the type of information that Allen could reasonably rely on to form his opinion. As *863 did the medical examiner in Capehart, Allen relied on the inadmissible evidence in conjunction with other facts to develop his opinion. The trial court's ruling precluded disclosure of Allen's measurements of the skid mark on direct examination. Based on Capehart, the trial court did not abuse its discretion in overruling the defense objection to Allen's testimony.
AFFIRMED.
STEVENSON and GROSS, JJ., concur.
HAZOURI, J., concurs specially with opinion.
HAZOURI, J., concurs specially with opinion.
I concur, but write to identify a fourth juror, who when challenged for cause, should have been excused. This fourth juror is juror Inman who was identified by defense counsel as the juror he would peremptorily challenge if the trial court granted him more peremptory challenges. Juror Inman stated that he received information about this case from the television and the newspaper. In addition, he stated that he discussed it with a group at his local barbershop, and the group "pretty much all decided that Carratelli was probably guilty of the charge." Carratelli's defense concerning the diabetes was felt to be an excuse. Inman claimed, however that he did not participate in the conversations but only overheard these conversations. Inman also read an article in the Palm Beach Post concerning the case; however, he stated that the article really did not do that much for him because he thought it was more of an editorial than an objective article. In addition, the following colloquy took place:
Defense: Would you say that this is a fair statement that you have an opinion about the defense but it's notyou have not positively made up your mind?
Inman: That's correct.
Defense: But it would certainly be more difficult for Mr. Carratelli to convince you of his innocence now than if you had not read the article had not been involved in that discussion?
Inman: I believe that's a fair statement.

Defense: Even though, of course, you know, we know that in a pure world you wouldn't have read it, and that you should be able to put things out of your mind; obviously it's in there, right?
Inman: That's correct.
Defense: That's correct.
Court: Mr. Inman, you used a phrase a minute ago but I don't want to put words in your mouth, as to this type of defense; I gather that you think it's possible there is a medical explanation that would explain the situation?
Inman: Well, there's a possibility that that could happen.
Court: And regardless of what discussions you had already, you'd be willing as a juror, to sit here and listen to whatever medical testimony you hear?
Inman: Absolutely.
Court: Whether it makes sense or it doesn't?
Inman: Yes.
Court: Would you be able to set aside any input you had, bias or prejudice, and sit here and assure us all that you can be a fair and impartial juror?
Inman: If I come in here as a juror, I will sit down with an open slate and listen to what is said and make up my mind from there.
(Emphasis added.)
At the conclusion of the questioning of prospective jurors, the defense counsel moved to strike juror Inman for cause which the trial judge denied.
*864 Carratelli is presumed to be innocent until the State proves guilt beyond any reasonable doubt. His sole defense was that a previously undiagnosed diabetic condition caused a syncopal episode resulting in the crash. Juror Inman's expressed view that it would be more difficult for Carratelli to now convince him of his innocence, i.e. that Carratelli had a syncopal episode, because juror Inman had read the article and had listened to the discussion at the barbershop creates a reasonable doubt that juror Inman could be fair and impartial. The trial court's attempt to rehabilitate juror Inman fails to persuade me otherwise.
NOTES
[1] Sergeant Davis narrated as the videotape was playing. When the tape came to the skid marks he had described, he said:

[N]ow, you can hardly see it but right in this area here is the very light skid; that's one of the ones I was referring to. You can barely see it. If I back this up, you will see it for a second and then it disappears. It comes in and comes actually to there, across right there; very light. Comes in and that's what I referred to that comes to the initial [point of collision].
[2] We note that from viewing the physical condition of the Mercury from photographs in evidence, even a lay person would conclude that the speed of the defendant's Mercedes was great at the time of impact.